[No. A021574. First Dist., Div. Four. Apr. 24, 1986.]

STEVEN KATSARIS, Plaintiff and Appellant, v.
MELVIN KENNETH COOK et al., Defendants and Respondents.

**COUNSEL**

Pano Stephens and Stephens & Williams for Plaintiff and Appellant.

Leo M. Cook, Thomas F. Byrne and Babin, Seeger & Byrne for Defendants and Respondents.

## OPINION

**POCHÉ, Acting P. J.**—Plaintiff and appellant, Steven Katsaris, brought an action for damages, negligence and intentional infliction of emotional distress resulting from the shooting of his two dogs by defendant and respondent, Melvin Kenneth Cook. Also named as defendants were Cook's employers, Robert C. and Betty Harvey. Defendants' motion for a judgment was granted at the close of plaintiff's case and judgment entered. Plaintiff appeals. We affirm the judgment as to plaintiff's claims for damages and negligence, but remand the emotional distress claim to the trial court for its further consideration.

### I.

Steven Katsaris lived alone on a 120-acre plot of land adjacent to an 80-acre ranch occupied by Mr. and Mrs. Harvey. Katsaris kept two Belgian sheep dogs—a female who was his pet and a male who had been specially trained to provide personal protection for Katsaris. As was his custom when he left town, in May 1982, when Katsaris was away on business he left the dogs in the care of two neighbor boys, Patrick and Jeff Schuette, 15 and 14 years old respectively. About 8 a.m. on May 17, 1982, while the boys were cleaning the dogs' kennels, the sheep dogs wandered away and would not come when called. Despite the boys' efforts and those of their father, the dogs remained loose.

About 1 in the afternoon the dogs were shot on the Harvey's property by their employee, 19-year-old Melvin Cook. Cook's accounts of the shooting were highly inconsistent. In a declaration he claimed the dogs lacked identification, were biting and mauling the Harvey's own dog who was chained up, and were worrying cattle penned nearby. At trial Cook testified that the sheep dogs were not biting or mauling the Harvey's dog, but were merely growling which upset the cattle, and that after he shot the sheep dogs he had not looked for identification tags on them.

Furthermore, he testified that it was his decision to dispose of the two corpses by dumping them into a ditch on the Harvey's property. According to Cook's declaration and his statement to the sheriff, he dumped the corpses at the direction of the Harveys or of Mr. Harvey. Cook told Mrs. Harvey about the shooting when she arrived home late in the afternoon of the 17th.

When Katsaris returned from his business trip on the evening of May 17 he found a note from the Schuette brothers telling him the dogs were loose.

He searched without success that evening. The next day he widened his search by visiting various neighbors, including the Harveys, to inquire about his dogs and ask that they call him if the dogs were spotted. Mrs. Harvey denied seeing the dogs. On the following day, May 19, Katsaris again visited the Harvey home and showed Mrs. Harvey photographs of the dogs. She once more denied having seen the sheep dogs.

Ten days after the dogs disappeared Katsaris was taken to identify their decomposed remains by the Schuette family, one of whose sons had been told about the shooting by Cook. When the remains were discovered only the female still wore her collar and neither dog had ID tags.

## II.

Katsaris contends the trial court erred when it granted defendants' motion for a judgment under Code of Civil Procedure section 631.8 as to all three of his claims. The trial court found that Food and Agricultural Code[1] section 31103 precluded all three claims. That section provides in pertinent part that "any dog entering any enclosed or unenclosed property upon which livestock or poultry are confined may be seized or killed by the owner or tenant of the property or by any employee of the owner or tenant. No action, civil or criminal, shall be maintained against the owner, tenant, or employee for the seizure or killing of such dog."

The judicial construction of this statute is apparently a matter of first impression. Katsaris advances an interpretation of section 31103 which requires the dog to enter either a walled and roofed ("enclosed") or an unroofed and partly open pen, coop or corral ("unenclosed") area containing animals before it can be seized or killed.

We interpret statutory language "according to the usual, ordinary import of the language employed in framing [it]." (*In re Alpine* (1928) 203 Cal. 731, 737 [265 P. 947, 58 A.L.R. 1500]; *Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) Surely the statute means *land* when it refers to *property*. Thus, the Attorney General has restated the section as follows: "Any dog entering property outside a city on which livestock or poultry are confined may be seized or killed by the landowner, tenant or the employee of either." (63 Ops.Cal.Atty.Gen. 562, 564 (1980).)

---

[1] All further statutory references are to the Food and Agricultural Code, unless otherwise indicated.

■ By enacting section 31103 the Legislature found the public's interest in protecting farm animals outweighed the dog owners' right to permit their animals to roam freely on land occupied by livestock.[2] ■ ■ ■ ■ ■

---

[2]Statutes such as section 31103 apparently reflect the dog's disadvantaged status at common law where it was not considered property. (Comment, *Animal Law in California* (1985) 12 Pepperdine L.Rev. 567, 590.) However, we cannot say that in modern day California, where ranches are often located next door to suburbia, that there is no longer any need to protect livestock from packs of or *from* individual roaming dogs. Reports of farm animals being killed or mutilated periodically appear in the news media such as a recent article entitled *When Pets Become Killers*. (S.F. Chronicle (Mar. 7, 1986) at p. 6, cols. 1-4.)*

In discussing dogs and the common law the dissent makes much of the language "lawful inclosure" in the case of *Sabin* v. *Smith* (1915) 26 Cal.App. 676, 680 [147 P. 1180]. (Dis. opn., *post,* p. 272) Both the *Sabin* case and the earlier case of *Johnson* v. *McConnell* (1889) 80 Cal. 545, 548 [22 P. 219], were cases construing Civil Code section 3341 which permitted killing of a dog caught in the act of worrying, wounding, or killing farm animals. In *Sabin* the worrying dog had actually entered the enclosure in which the worried poultry was kept. Thus, the *Sabin* case quite understandably emphasized that the fowl were enclosed, and hence helpless, as justification for the poultry owner's need to take immediate action to protect his property rights in the chickens. The *Sabin* court found protection for animals not enumerated in the statute, hence the rule stated in the case is really a fact-specific worst case, e.g., dog within the enclosure, which permitted the court to rely upon a general common law right to act even where statute provided no privilege for the actor. (Dis. opn., *post,* p. 271.)

In *Johnson* the court makes no reference to any common law rule because the case is construing the specific provisions of Civil Code section 3341. To that end the court distinguishes a case reaching the opposite result under a differently worded statute. (*Johnson* v. *McConnell, supra,* 80 Cal. at p. 551.)

*"*When Pets Become Killers* [¶] The two pet dogs looked harmless enough, out for a Saturday romp in a rainsoaked Marin County pasture where sheep were grazing. [¶] Then canine instinct took over and the cute dogs, one brown and one black, suddenly acted like hunters. [¶] When they were through, seven badly mauled ewes and 20 lambs lay dying on the bloodstained ground near San Domenico School in San Rafael. Don Mills, owner of the slain livestock, said it was the worst such attack he had seen in 35 years of ranching. [¶] Dog attacks on livestock increase during the winter lambing season, according to animal control officers around the Bay Area. Yet the problem persists year round, resulting in the death or maiming of a wide range of livestock and wild animals. [¶] The part-time predators have been known to attack animals much larger than themselves. Last year, a registered dairy cow valued at $50,000 was killed by dogs in Sonoma County, according to the California Farm Bureau Federation. [¶] 'There is no doubt that when dogs run loose this way, they undergo a behavior change that most of their owners would not recognize,' said Diana Allevato, Marin County Humane Society director, after the attack on Mills' flock several weeks ago. [¶] Wherever open space collides with residential development, some seemingly docile pets lead double lives. [¶] The problem is not limited to large dogs. Cocker spaniels and small poodles have been seen hunting in packs with other dogs. [¶] 'Even in Hillsborough, people let their dogs go romping loose, and they have been known to run down deer and kill them,' said Paul Galloway, animal control manager for San Mateo County. [¶] In Santa Clara County, animal control officials give farmers posters to display on their fences, warning naive dog owners that their pets may be shot if they stray onto pastureland. [¶] 'Dogs are naturally predatory animals,' said, Bob Gantt, supervisor of animal control services for the county. 'A dog will chase, bring down and kill, and he's not being anything but a dog.' [¶] 'They'll do their marauding, then trot on home. People just can't believe it—they say, "Not my dog." The dog can go home with a bloody chicken in his mouth and the owner will say he must've just found it somewhere, already dead.' [¶] 'They think their dog is just going down the street to visit his friend the Irish setter,' Allevato said, 'In fact, he picks up his friend and they go into the hills to harass and kill livestock.' [¶] A 1983

To promote the Legislature's goal, it gave livestock owners, in section 31103, a privilege to kill or seize trespassing dogs.[3]

Farm Bureau survey of California sheep ranchers showed that dogs and coyotes each commit about half the attacks on sheep, with dog attacks concentrated closer to urban areas. [¶] The majority of dog attacks on livestock and wild animals are committed by pets, animal control officials say. The dogs that killed Don Mills' sheep were described as medium-size, possibly a Chow and a retriever, each wearing a collar and tag. [¶] They got away. But Mills shot two other dogs—one fatally—when they invaded his sheep pen on Lucas Valley Road a few days later. [¶] 'I don't blame the dogs,' said Mills, 'I blame the owners.' [¶] Although pets do most of the hunting in the Bay Area, there are a few cases of wild dogs living by tooth and claw in parks and other open spaces. [¶] Police for the East Bay Regional Park District report that packs of wild, or feral, dogs can be seen from the air during helicopter patrols of the Hayward shoreline, Briones Regional Park and the Las Trampas and Sunol regional wilderness areas. [¶] Several of the animals have been shot and killed by park police for attacking deer. Authorities say the wild dogs are usually wary of humans, but can be dangerous if they are interrupted while attacking their prey."

[3]In its summary of the legislative history of sections 31102 and 31103 the dissent conclusively demonstrates that these sections ultimately derive from the 1921 general law as amended in 1929 establishing a comprehensive scheme for the regulation of dogs. (Dis. opn., *post*, pp. 273-274) What the legislative history does not reveal, however, is a persuasive argument for the next step the dissent takes in reading the " 'enclosed or unenclosed property' " language of section 31103 to mean that trespassing dogs must enter an enclosed or unenclosed enclosure in which livestock or poultry are confined before the dogs can be killed or impounded.

The 1921 law added a number of new features to California dog law. It made it unlawful for "any person to permit any dog . . . to run at large on any farm on which livestock or domestic fowls are kept, . . ." (Current § 30955, added by Stats. 1921, ch. 757, § 3, p. 1306.) Likewise the 1921 law permitted impoundment of a dog "straying on any farm whereon livestock or domestic fowls are kept." (1921 Stats., ch. 757, § 4, p. 1306.) We read the new provision in the 1929 amendment permitting the killing of a dog "entering any enclosed or unenclosed property upon which livestock or poultry are confined" to be a change in the prior law. Whether the change was a good or a bad legislative decision is irrelevant to our inquiry. It has long been the rule that the police power of the state permits it to regulate, even to the point of death, the lives of dogs. "[F]rom time immemorial, [dogs have] been considered as holding their lives at the will of the [L]egislature, . . ." (*Sentell v. New Orleans &c. Railroad Co.* (1897) 166 U.S. 698, 702 [41 L.Ed. 1169, 1171, 17 S.Ct. 693].)

Likewise we reject the dissent's contention that our reading of section 31103 does not logically relate to the provisions of section 31102.

Section 31102 provides in pertinent part: "any person may kill any dog in any of the following cases: [¶] (a) The dog is found in the act of killing, wounding, or persistently pursuing or worrying livestock or poultry on land or premises which are not owned or possessed by the owner of the dog. [¶] (b) The person has such proof as conclusively shows that the dog has been recently engaged in killing or wounding livestock or poultry on land or premises which are not owned or possessed by the dog's owner."

We construe sections 31102 and 31103 to address very different circumstances. Section 31102 creates a broad privilege in "any person" to kill any dog which is misbehaving or has misbehaved around livestock, other than livestock on the premises of the dog's owner. Such a dog may be killed at any time or any place by any person and his killing will be privileged. This broad rule is entirely consistent with the need for stringent measures when a dog has proclivities to injure or worry farm animals.

In contrast, section 31103 creates a privilege to kill a dog which is not misbehaving only in the "*owner or tenant* of the property" or in their employees, and only when the dog enters upon their property. While the dog's conduct is much less culpable, in essence no more than trespass, the occupant of the property is given broad discretion either to kill or

A privilege is either absolute or conditional. Absolutely privileged conduct does not permit any remedy by way of a civil action, regardless of whether or not the privileged conduct was undertaken in bad faith or with malice. (*Saroyan* v. *Burkett* (1962) 57 Cal.2d 706, 708 [21 Cal.Rptr. 557, 371 P.2d 293].) A qualified or conditional privilege protects the actor only if he acts for the purpose of advancing or protecting the interest which the privilege seeks to protect. (Rest.2d Torts, § 10, com. *d*, p. 18.) The privilege created by section 31103 is a qualified privilege under the definitions employed by the Restatement, because it protects nonofficial actors and is based upon the value of the interest protected. (*Ibid.*) Likewise sections 31152 and 31153, parallel sections to 31102 and 31103, create, according to Witkin, a qualified privilege to kill or seize trespassing dogs. (4 Witkin, Summary of Cal. Law (8th ed. 1974) Torts, § 166, p. 2454.) Thus, under a qualified privilege an actor may be liable for conduct which he undertakes with an improper motive.

Likewise a qualified privilege may be lost if the actor engages in conduct outside the scope of the privilege, thus "abusing" it. (Rest.2d Torts, § 890, com. *e*, p. 358.) The scope of the privilege created by section 31103 is not clear from its face. The statute proscribes liability for "seizure" or "killing" of a trespassing dog.

The general rule of statutory construction is that a legislative grant of privilege or immunity is strictly construed against the grantee. (3 Sutherland, Statutory Construction (4th ed. 1974) § 63.02, p. 81.) However, the statute must only be strictly construed where it grants a privilege as against the general public as distinguished from a right against some other party. (*Ibid.*) Section 31103 grants livestock owners immunity from both civil and criminal liability. Thus, the privilege is both immunity from crim-

---

to seize the dog which comes onto his land.

By way of illustration, if rancher Smith looks over at his neighbor Jones' land on which Jones keeps livestock confined and sees Wolf's dog trespassing there, he may not injure the dog in any way unless Wolf's dog worries Jones' livestock or unless Smith has proof that Wolf's dog has in the past worried livestock on land not owned by Wolf. Section 31102 permits Smith to intervene only where Wolf's dog acts or has acted badly. Should Wolf's dog, however, venture onto Smith's land where Smith keeps livestock confined, Smith may kill the dog with impunity; under section 31103 he need not wait for the dog to pursue or injure his animals, and certainly not for the dog to actually enter the corral or shed in which the animals are confined. On his own land Smith may treat the trespass of the dog as sufficient evidence of its bad intent. This rule may be a harsh one, but it is not inconsistent with section 31102 which permits anyone, at any time, and in virtually any place to kill a dog who behaves aggressively around livestock. The two sections simply address different situations.

The dissent is much distressed by the harshness of the reading we adopt for section 31103. Yet the dissent does not mention that any county may avoid the harsh result of sections 31102 and 31103 by adopting the stricter provisions for control of trespassing dogs embodied in sections 31152 and 31153.

inal actions brought in the name of the people and immunity from claims brought by individual dog owners. Because the privileged killing of a dog deprives its owner of his property rights in the animal without his consent the statute should be construed strictly. (*Trumpler* v. *Bemerly* (1870) 39 Cal. 490, 491 [statute permitting sale of stray livestock].)

To determine the scope of the section 31103 privilege we borrow the analytical model adopted by this court in defamation cases. ▆ In analyzing the absolute privilege protecting communications made in judicial proceedings (Civ. Code, § 47) we use a two step analysis. First, what is the policy rationale which underlies the privilege? Second, does that policy justify applying the privilege to this particular conduct? (*Bradley* v. *Hartford Acc. & Indem. Co.* (1973) 30 Cal.App.3d 818, 824 [106 Cal.Rptr. 718] [dismissal on demurrer reversed where complaint alleged defamatory publication was made in court documents which were not filed in furtherance of pending litigation].)

▆ If the policy choice made by the Legislature in enacting section 31103 is to protect livestock owners from economic loss stemming from the death or injury of their animals, then arguably conduct by livestock owners which goes beyond what is necessary to protect their livestock from trespassing dogs is not covered by the privilege.

Any conduct necessary to the killing of a trespassing dog will be within the privilege. Decisions by the owner of livestock about when, where or how to kill a trespassing dog and dispose of its body, as well as the owner's delegation of those decisions to his employees, is conduct which comes within the privilege.

In applying this test to the case before us we conclude that the trial court correctly granted defendants' motion for judgment as to the first cause of action—the claim for damages arising from the killing of the dogs. The question before us is whether the motion for judgment[4] was also properly granted as to Katsaris' other two claims, the causes of action for negligence and for intentional infliction of emotional distress. Are both these claims likewise within the privilege created by section 31103?

Katsaris alleged that the Harveys negligently permitted guns to be kept and to be shot on the ranch near habitable structures, that they negligently supervised, and that they negligently withheld facts of the dogs' deaths. In all of these claims except the last, if the duty of care was breached by the

---

[4]Code of Civil Procedure section 631.8, subdivision (b) permits the trial court to grant a partial motion for judgment.

shooting of the dogs, the claim is barred by section 31103. ■ In the last claim—which alleges that the Harveys negligently failed to tell Katsaris what had happened—the alleged breach was not an act necessary to the killing itself, and thus would not be barred by the statute. The trial court could have granted the motion for judgment on the ground that the Harveys had no duty to tell Katsaris what had happened to his dogs, and therefore Katsaris had not established a prima facie case of negligence. Instead, the court found the negligence claim barred by section 31103. Because there is no duty to speak, Katsaris has no claim for negligent infliction of emotional distress against the defendants. Therefore, we affirm the granting of the motion for judgment on the second cause of action.

■ Katsaris' third cause of action was for intentional infliction of emotional distress. ■ If the factual basis of this claim lies in the manner in which the defendants killed the dogs or disposed of their bodies, then the privilege of section 31103 bars the claim. Both the manner of killing and of disposing of the carcasses are matters so intimately linked to the deaths that they are within the scope of the privilege. ■ However, to the extent that the basis of the claim lies in Mrs. Harvey's post shooting assertions that she knew nothing about the dogs or their whereabouts, her conduct does not come within the scope of the privilege created by section 31103.[5]

■ To prevail on his intentional distress claim Katsaris would have to prove that Mrs. Harvey's conduct was extreme and outrageous, that she acted with intent to cause him emotional distress or with reckless disregard of the probability of causing him emotional distress, that he suffered severe distress, and that her conduct was the actual and proximate cause of his injury. (*Davidson* v. *City of Westminster* (1982) 32 Cal.3d 197, 209 [185 Cal.Rptr. 252, 649 P.2d 894]; *Fletcher* v. *Western National Life Ins. Co.* (1970) 10 Cal.App.3d 376, 394 [89 Cal.Rptr. 78, 47 A.L.R.3d 286].)

■ Normally the test of extreme and outrageous conduct is an objective one—would the conduct involved outrage the "average member of the community"? (BAJI No. 12.74 (6th ed. 1977); *Newby* v. *Alto Riviera Apartments* (1976) 60 Cal.App.3d 288, 297 [131 Cal.Rptr. 547].) The outrageousness of the conduct may arise instead, however, from the actor's knowledge of the plaintiff's particular susceptibility. (BAJI No. 12.76 (6th ed. 1977); *Newby* v. *Alto Riviera Apartments, supra,* at p. 297.) ■ In the case at hand Mrs. Harvey arguably knew by the time of Katsaris' second

---

[5]There was no evidence before the court that Mrs. Harvey's conduct was malicious and thus an abuse of the qualified privilege granted by section 31103. According to her statements to the deputy sheriff she did not contact Katsaris because she did not have his telephone number.

visit to her house that he was extremely concerned by the disappearance of the dogs and anxious to locate them.

■ The specific intent required for intentional infliction of emotional distress is that the defendant either acted intending to inflict the injury or with the realization that the injury was substantially certain to result from his conduct. (*Davidson* v. *City of Westminster, supra,* 32 Cal.3d at p. 210; BAJI No. 12.77 (6th ed. 1977).) Alternatively, the defendant may fulfill the specific intent requirement if he acts recklessly in disregard of the likelihood that he will cause emotional distress to the plaintiff. (*Spackman* v. *Good* (1966) 245 Cal.App.2d 518, 530 [54 Cal.Rptr. 78]; BAJI No. 12.77 (6th ed. 1977).)

■ Reckless disregard can, like any other specific intent, be proven circumstantially by inference from the conduct of the actor. (Evid. Code, § 665; *Pelletti* v. *Membrila* (1965) 234 Cal.App.2d 606, 611 [44 Cal.Rptr. 588].) In the context of section 31103, however, it is not, as a matter of law, sufficient to prove reckless disregard by showing merely that the livestock owner failed to notify the dog's owner of its death, or failed upon inquiry by the dog's owner to tell him what happened to the dog or lied in response to inquiry by the owner.[6]

Unless these limitations circumscribe an emotional distress claim made where the killing itself is privileged under section 31103, the purpose of the section's privilege will be hopelessly undercut. The irate dog owner whose pet has been killed will not be able to bring an action for damages for the loss of the dog, but he will be able to get to a jury on the claim that the livestock owner intentionally caused the dog owner emotional anguish by failing to notify him of his pet's death, or by not being truthful or forthcoming when asked about its fate. A more lenient rule would disturb the balance of economic interests apparently intended by the Legislature.[7] Livestock owners, insulated by section 31103 from often negligible liability for the value of the destroyed dog, would instead be exposed to potentially substantial liability for the dog owner's emotional suffering.

Because Mrs. Harvey's post shooting conduct was not within the scope of the privilege created by section 31103, the trial court erred when it

---

[6]In the case before us we do not decide whether Mrs. Harvey's conduct went sufficiently beyond the acts outlined above to demonstrate her reckless disregard for Katsaris' emotional distress.

[7]Section 31103 is one of a group of statutes which have been criticized because they protect the economic interests of some members of the public (here livestock owners) at the expense of a property loss suffered by other members of the public (here dog owners whose pets are destroyed). (See Van Alstyne, *Statutory Modification of Inverse Condemnation: Deliberately Inflicted Injury or Destruction* (1968) 20 Stan.L.Rev. 617, 631, appen., table I.)

granted the motion for judgment as to the claim for intentional infliction of emotional distress. On a motion for judgment the trial court is authorized to, and required to act as a trier of fact. (Code Civ. Proc., § 631.8; *County of Ventura* v. *Marcus* (1983) 139 Cal.App.3d 612, 615 [189 Cal.Rptr. 8].) Here the trial court viewed the emotional distress claim as barred by section 31103, and thus it did not reach the merits of that claim. We remand to the trial court for the limited purpose of determining, in light of the foregoing discussion, whether Katsaris proved his claim for intentional infliction of emotional distress.

The judgment is reversed insofar as it dismisses plaintiff's cause of action for intentional infliction of emotional distress; in all other respects the judgment is affirmed. Each party to bear its own costs on appeal.

Channell, J., concurred.

**SABRAW, J.**—I concur and dissent.

Today we speak of but the killing of two dogs—perhaps not a thing of great moment to some—but to others the loss of a dog leaves memories of loyalty and devotion seldom equalled in any other relationship. In the words of Lord Byron: "Near this spot are deposited the remains of one who possessed beauty without vanity, strength without insolence, courage without ferocity, and all the virtues of Man, without the vices. This praise, which would be unmeaning flattery if inscribed over human ashes, is but a just tribute to the memory of Boatswain, a dog." (Lord Byron, Inscription to the monument of a Newfoundland dog (1808).)

When Mr. Katsaris returned home in the evening of May 17, 1982, to find his two Belgian Tervuren sheep dogs missing he immediately undertook what eventually turned into a 10-day vigil and nightmare in search of his 2 "constant companions" and "protector[s]." He went to all of his neighbors with pictures of the dogs seeking information from anyone who might have seen them. He got up early in the morning and called and walked the woods. He went into town. He checked with the dog pound daily. The local radio station cooperated with announcements. A notice was placed in the local newspaper. He hired an airplane so he could search from the air. Each day he continued his search on foot for his friends. He searched at night after dark with a flashlight. On occasion sympathetic friends would join in the search. He visited two psychics in search of clues. He hired a helicopter to join in the search. In his contacts with his immediate neighbors, the Harveys, even photographs of the dogs did not produce any knowledge of their whereabouts or fate—nor did the passing of the 7th, the 8th or the 9th day. On the 10th day at a point of grief, disappointment and despair and at a

time when he "was finding it harder to lose those dogs almost than when my daughter was killed," a phone call interrupted the unknowing. The dogs had been found by a friend in a ditch on the Harvey Ranch "maybe a quarter of a mile from my fence line, maybe an eighth of a mile." When he saw the dogs in the ditch "they had been there 10 days in the heat. There were maggots crawling from the cavities. . . . We loaded the remains of the dogs, took them up to my place and buried them." The long vigil was over.

We are called upon to interpret statutes which authorize one man to kill another man's dog. We know that in any civilized society the authority to kill any living being must be viewed with the greatest of caution. I submit under today's rules we condone the killing of a dog only as a last resort. We have come a long way from the old common law concept of a dog not even being considered property. Not only is he more than property today, he is the subject of sonnets, the object of song, the symbol of loyalty. Indeed, he is man's best friend.

My colleagues in the majority would have us conclude that mere trespassing by a dog anywhere on a neighbor's land where livestock or poultry are kept is legal justification for killing the dog. There is neither legislative history, rules of construction, nor the thread of today's civilized attitudes in support of the statutory interpretation given by the majority. We have come too far from the law of the Pecos for that brand of "taking the law into one's own hands" remedy to survive today. We have in this age of surfacing humanitarianism recognized the need for pet doctors, pet hospitals, pet cemeteries and even a society for the prevention of cruelty to pets. All of this stands in stark contrast to the majority's interpretation of the code sections in question as giving livestock owners the unbriddled authority to decide "when, where or how to kill a trespassing dog and dispose of its body. . . ." (Majority opn., *ante*, p. 266.)

If we had only Food and Agricultural Code section 31103[1] to guide us in our task, the majority opinion could find some support as a logical reading of the statute. Closer scrutiny, however, leads to a contrary conclusion. In this instance we have over 100 years of statutory history and case law as well as closely related statutes such as section 31102 to assist us.[2] Virtually

---

[1] Unless otherwise indicated all statutory references are to the Food and Agricultural Code.

[2] In relevant part, section 31102 provides: "[A]ny person may kill any dog in any of the following cases: (a) The dog is found in the act of killing, wounding, or persistently pursuing or worrying livestock or poultry on land or premises which are not owned or possessed by the owner of the dog.

(b) The person has such proof as conclusively shows that the dog has been recently engaged in killing or wounding livestock or poultry on land or premises which are not owned or possessed by the dog's owner. No action, civil or criminal, shall be maintained for the killing of any such dog."

all of this material is ignored by the majority. My analysis of these materials convinces me that the Legislature intended the term "enclosed" in section 31103 ("entering any *enclosed* or unenclosed property upon which livestock or poultry are *confined*" (italics added)) to refer to a barn or like structure, and the term "unenclosed" to refer to a corral, coop, pen or like structure where animals are confined. The animals would not be otherwise "confined" if such types of structures were not intended by the statutory language used.

### THE COMMON LAW AND LEGISLATIVE HISTORY

The common law developed rules to address the well-justified needs of farmers and ranchers to protect their livestock and fowl from trespassing and threatening dogs. The general rule at common law was that "[t]he natural right has always existed in one to defend his fowls [and other domestic animals] upon his own premises from the attack of trespassing dogs." (*Smith* v. *Sabin* (1915) 26 Cal.App. 676, 678 [147 P. 1180], citing 2 Cooley on Torts (3d ed.) p. 702.) This right of protection extended to permit the killing of someone else's dog under specified circumstances. At the same time, in recognition of the special relationship of man and dog as well as the fact that dogs are by their nature free spirits which love to roam and frolic like their wild forebearers, the common law addressed the legitimate concerns of dog owners by limiting the privilege to kill trespassing dogs to situations where the dog was found to have actually harmed domestic animals. (*McConnell* v. *Johnson* (1889) 80 Cal. 545; *Smith* v. *Sabin, supra,* 26 Cal.App. 676 [22 P. 219].)

The common law and California's first legislative enactment on this subject, Civil Code section 3341,[3] permitted the killing of a trespassing dog if it was found in the act of (1) killing domestic animals or (2) pursuing or worrying domestic animals in an enclosure.

---

[3]The Legislature first enacted Civil Code section 3341 in 1883. It dealt with the subject of trespassing dogs and domestic animals and provided: "The owner, possessor, or harborer of any dog or other animal that shall kill, worry, or wound any sheep, Angora or Cashmere goats shall be liable to the owner of the same for the damages and costs of suit, to be recovered before any Court of competent jurisdiction. [¶] 1. In the prosecution of actions under the provisions of this chapter it shall not be necessary for the plaintiff to show that the owner, possessor, or harborer of such dog or other animal had knowledge of the fact that such dog or other animal would kill or wound such sheep or goats. [¶] 2. Any person on finding any dog or dogs not on the premises of its owner or possessor, worrying, wounding or killing any sheep, Angora or Cashmere goats, may at the time of so finding said dog or dogs, kill the same, and the owner or owners thereof shall sustain no action for damages against any person so killing such dog or dogs." (Stats. 1883, ch. 55, § 1, p. 283.)

Civil Code section 3341 still exists today in substantially the same form as it did in 1883, but now identifies a broader category of animals for protection.

Civil Code section 3341 was first interpreted in *Johnson* v. *McConnell, supra,* 80 Cal. 545. Plaintiff Johnson brought an action against defendant McConnell to recover the value of the three valuable hunting dogs worth $225 (a considerable sum in those days) which McConnell had killed. On the afternoon of the killings, McConnell viewed several dogs at a distance in his mother's field with several hundred ewes. He retrieved his rifle and returned to the field. Finding the ewes still running about in an agitated and frightened manner, McConnell pursued the dogs when they fled from the field and shot and killed them about a quarter of a mile away. As in the present case, the evidence showed that the plaintiff had a great affection for and relationship with his dogs. The trial court entered judgment for McConnell, finding that the killing fell within the privilege of section 3341.

On appeal, the Supreme Court reversed, holding that the dog "must be actually doing the wrongful act to authorize the taking of his life" (*Johnson* v. *McConnell, supra,* 80 Cal. 545, 550) and that a killing is privileged under Civil Code section 3341 only when "the dogs [are] actually caught in the act of worrying the [animals], and then and there [are] killed." (*Id.,* at p. 551.) Because McConnell let the dogs out of his sight when he went to retrieve his rifle, let them escape from the field where the sheep were confined, and killed Johnson's dogs only to prevent their return rather than to stop them from worrying or killing the sheep at the time they were shot, the court concluded the killings were unjustified by the statute. (*Id.,* at pp. 550-551.)

Civil Code section 3341 was next interpreted 26 years later in *Sabin* v. *Smith, supra,* 26 Cal.App. 676. The *Sabin* court held that the statute did "not confer upon the owner of sheep or fowls any power to kill a dog that such owner did not possess at common law, nor [did] it in any manner abridge his right. On the contrary, the section expressly provides cumulative remedies that did not ordinarily generally exist [at common law]. By providing for such cumulative remedies with reference to sheep, the statute cannot be said to deprive the owner of fowls of the right to destroy a dog that is engaged in worrying and killing them *while in their own lawful inclosure,* and where the necessity for the killing is apparent, in order to protect such fowls." (*Id.,* at p. 680, italics added.) The emphasized language is significant to our present inquiry, for it uses the phrase "lawful inclosure" in referencing the common law rule.

The majority emphasize that in their view sections 31102 and 31103 address very *different* circumstances in which the killing of a dog is authorized. In my view, the two code sections actually address the *same* type of conduct that will justify the killing of a dog—the aggressive pursuing of cattle or poultry. The point of emphasis is that only when a dog is engaged

in the threatening conduct proscribed by the two code sections does authority exist to kill the dog and under neither code section is killing authorized for mere trespass. I suggest the appropriate means for arriving at the correct interpretation is to examine the legislative history of sections 31102 and 31103. When reviewed, this reveals the highly relevant fact that the two statutes derive from one three-paragraph legislative enactment in 1929.

In 1921 a comprehensive, noncodified, general law was enacted to establish a statewide plan for the licensing and tagging of dogs.[4] In 1929, the 1921 general law was amended to more specifically address the subject of trespassing dogs attacking farm animals.[5] That amendment is directly relevant to the interpretation of the statutes before us because it is the statutory predecessor to current sections 31102, 31103 and 31104. A comparison will show that paragraph one of section 4a was the origin of section 31102.

The key second paragraph of new section 4a no longer required that the dog in question be found to have attacked or worried any domestic animal before it could be killed. It simply required that the dog have entered a forbidden area, defined as "any enclosed or unenclosed property wherein live stock or poultry are confined." Analysis of the wording of that second

---

[4]In relevant part, the general law provided: [Sections 1 and 2 omitted.] "Sec. 3. It shall be unlawful for any person to suffer or permit any dog owned, harbored or controlled by him to run at large on any farm whereon live stock or domestic fowls are kept, without the consent of the owner thereof; . . . [¶] Sec. 4. It shall be unlawful for any person to kill, injure or impound any dog, the owner of which has complied with the provisions of this act; *provided,* that nothing herein contained shall prohibit any person from killing or impounding any dog which he sees in the act of attacking, killing or persistently pursuing or worrying any live stock or domestic fowls in any enclosure or in any district where measures have been adopted by the state, county or city for the control of rabies; *provided, further,* that any owner, lessee or employee may detain or impound any dog found straying on any farm whereon livestock or domestic fowls are kept." [Sections 5-11 omitted.] (Stats. 1921, ch. 757, p. 1306, italics in original.)

[5]The 1929 amendment provided in relevant part: "Sec. 2. Section 4 of said act [(the 1921 general law enactment)], as amended, is hereby amended to read as follows: Sec. 4. It shall be unlawful for any person to kill, injure or impound any dog, the owner of which has complied with the provisions of this act, except as otherwise provided herein. [¶] Sec. 3. A new section is hereby added to said act as amended to be numbered 4a to read as follows: Sec. 4a. Any person shall have the right to kill any dog found in the act of killing, wounding or persistently pursuing or worrying any live stock or poultry on land or premises not owned or possessed by the owner of such dog, or if he shall have such proof as conclusively shows that such dog has been recently engaged in killing or wounding live stock or poultry on land or premises not owned or possessed by the owner of such dog, and no action, civil or criminal, shall be maintained therefor for killing such dog. [¶] *Any dog entering any enclosed or unenclosed property wherein live stock or poultry are confined may be seized or killed by the owner or tenant of such property or any employee of such owner or tenant and no action, civil or criminal, shall be maintained therefor against such owner, tenant or employee.* [¶] The provisions of this section shall not apply to dogs inside the corporate limits of any city, city and county, or town, or to dogs under the reasonable control of their owner or keeper, unless actually caught in the act of worrying, wounding, chasing or killing any live stock or poultry." (Stats. 1929, ch. 852, pp. 1882-1883, italics added.)

paragraph and later legislative history shows it was the origin of present day section 31103.[6]

In 1953, the foregoing general law was reenacted with minor, nonsubstantive changes in the Agricultural Code and the three paragraphs of section 4a became sections 439.18, 439.19 and 439.20, respectively. In 1967, there was an all-encompassing revision and reenactment of the Agricultural Code and the three sections were renumbered as sections 31102, 31103 and 31104, respectively. (The Agricultural Code was renamed the Food and Agricultural Code in 1972.) Thus, the statutes we interpret trace their history to the 1929 amendments of the general law first enacted in 1921.

With this legislative history in mind, I now turn to the structure of the current statutory scheme, which, in light of its historical origin, leads me to conclude that plaintiff's interpretation of section 31103 is correct.

## ANALYSIS

To begin, I agree with the majority's conclusion that the privilege to kill a trespassing dog granted by section 31103 should be strictly construed because the privileged killing of a dog under power of the statute deprives its owner of property rights without his consent. (*Trumpler* v. *Bemerly* (1870) 39 Cal. 490, 491 [statute permitting sale of stray livestock].)

Both section 31102 and section 31103 deal with property on which domestic farm animals are kept. However, unlike section 31102, when the Legislature enacted the predecessor to section 31103 in 1929 (par. 2 of new § 4a), it used different words to define the area of a landowner's property where the killing of a trespassing dog might be privileged. Section 31102 speaks of the trespassing dog actually having committed harm to domestic farm animals on the "land or premises" of someone other than the dog's owner, whereas section 31103 refers to the dog simply being found in "any enclosed or unenclosed property upon which livestock or poultry are confined." The use of those different words in two statutes which originated in two *consecutive paragraphs of the same statute, enacted at exactly the same time* (Stats. 1929, ch. 852, § 3, enacting new § 4a), signifies to me that the Legislature was seeking to protect domestic farm animals in two different circumstances. In cases where there was conclusive evidence that the trespassing dog had actually caused harm to domestic farm animals, the Leg-

---

[6]The third paragraph of new section 4a limited the application of section 4a to dogs which trespassed outside the corporate limits of a municipality and which were not under the control of their owners and which were actually found in the act of "worrying, wounding, chasing or killing any live stock or poultry." The current version of that paragraph is found in section 31104.

islature authorized a privileged killing. (Par. 1 of § 4a; § 31102.) However, in those circumstances where domestic animals had less chance to protect themselves from a trespassing dog because they were closely "confined" to an "enclosed or unenclosed" area of the landowner's property like a barn, a coop, or a corral, the Legislature chose to authorize a privileged killing *even when the dog had done no harm* (par. 2 of § 4a; § 31103). Thus, it is clear to me that, as a tradeoff for authorizing the privileged killing of a trespassing dog under this second, lesser degree of guilt standard, the Legislature used different words in section 31103 in order to further *limit* the circumstances under which the statute would apply.

Nevertheless, the majority reject the interpretation that section 31103 requires a trespassing dog to be found in an area where domestic animals are confined in some sort of walled and roofed structure (enclosed) or in a pen, coop or corral (unenclosed) before the privilege to kill of section 31103 will apply. Instead, the majority chops up the phrase "any enclosed or unenclosed property upon which livestock or poultry are confined" and interprets it as referring to any "land" where livestock or poultry are kept, even if the domestic animals are located miles from the place where the dog happens to wander. This interpretation leads to what the majority had to acknowledge is a "harsh" rule and would render an astray dog strictly liable under penalty of death for making a mistake as to boundary lines recognized only by his master.

In the words of the majority the mere trespass of a dog on land where livestock are kept gives the landowner authority to "kill the dog with impunity; under section 31103 he need not wait for the dog to pursue or injure his animals, and certainly not for the dog to actually enter the corral or shed in which the animals are confined." (Majority opn., *ante,* p. 265, fn. 3.) If the Legislature had intended section 31103 to authorize the killing of a dog running at large on property where livestock are present it would have said just that. Instead it provided that the dog must enter "enclosed" or "unenclosed property" where livestock are "*confined*" before a killing is authorized. (§ 31103, italics added.) Furthermore, the Legislature has elsewhere addressed the subject of a dog running at large on property where livestock are kept by providing in section 30955: "It is unlawful for any person to permit any dog . . . to run at large on any farm on which livestock or domestic fowls are kept. . . ." While section 30955 makes it "unlawful" for one's dog to run on another's land where livestock are kept and thus makes the dog's owner subject to penalty, it certainly does not authorize the killing of the dog for mere running at large. The same legislative intent is also found in section 31109: "Any dog which is found straying on any farm where livestock are kept . . . may be taken up, impounded and detained in the same manner as provided in this division. . . ." In keeping

with today's humane concerns for all animals, section 31109 goes on to provide: "The person taking up the dog may recover from the owner, in any court having jurisdiction, the fees fixed by the Board of Supervisors for taking up and keeping unlicensed and unidentified dogs, together with costs."

A further example of the same clear legislative intent is found in section 31104 (derived from par. 3 of § 4a) which expressly restricts the authority to kill a dog by mandating that "[t]he provisions of Sections 31102 and 31103 shall not apply to any dog which is inside the corporate limits of any city, . . . or to any dog which is under the reasonable control of his owner or keeper, unless the dog is actually caught in the act of worrying, wounding, chasing, or killing any livestock or poultry." Again, the Legislature was emphasizing the actual aggression of the dog as the criterion for authority to kill.

By equating the phrase "land or premises" in section 31102 with the phrase "enclosed or unenclosed property" in section 31103, the majority simply ignores the Legislature's repeated use since 1929 of the words "enclosed or unenclosed property"—a use which manifests an intent that the two phrases have different meanings. If the two different phrases were intended to have exactly the same meaning, as the majority now unpersuasively assert, there was absolutely no purpose served by use of the words "land or premises" instead of "enclosed or unenclosed property" or by addition of the extra qualifying word "confined" in section 31103.

It is a standard rule of statutory construction that statutes are to be interpreted so as to give meaning to all of the words in them. (*Moyer* v. *Workmen's Comp. Appeals Bd.* (1973) 10 Cal.3d 222, 230 [110 Cal.Rptr. 144, 514 P.2d 1224].) The majority's reading of section 31103 flies blithely over this well-settled rule and continues in flight high above and in total disregard for the legislative origins of the two "complimentary" code sections and in short departs from the catalogue of common sense.

I am satisfied from a review of the common law, legislative history and fundamental rules of statutory construction, that the killing of a trespassing dog is justified pursuant to section 31102 *anywhere* on the property of landowner (not just in enclosed or unenclosed areas where animals are confined) when anyone (1) finds such a dog actually in the act of wounding, worrying or killing domestic animals or (2) has conclusive proof that the dog has recently been engaged in such forbidden conduct. In the case of section 31103, however, we must ascribe a more limited meaning to the term "any enclosed or unenclosed property on which livestock or poultry are confined" than that which we attribute to the unrestricted phrase "land or premises"

in section 31102 in order to give the two phrases the different meanings intended by the Legislature.[7] Indeed, if we refer back to one of the formulations of the common law rule stated by the court in *Sabin* v. *Smith, supra,* 26 Cal.App. 676, when it interpreted Civil Code section 3341, we can see that such an interpretation of section 31103 comports with the common sense rule developed over hundreds of years by the common law. "[Civil Code section 3341] cannot be said to deprive the owner of fowls of *the right to destroy a dog that is engaged in worrying and killing them while in their own lawful inclosure, and where the necessity for the killing is apparent, in order to protect such [animals].*" (*Id.,* at p. 680, italics added.)

Thus, when a trespassing dog is found in an enclosed structure like a henhouse or in an unenclosed area like a corral where animals are "confined" and have little avenue for escape, it is reasonable to conclude that the dog has bad intentions, thereby justifying its killing. This is a rational result because domestic animals in such a situation would have far less chance to escape an attacking dog than animals which are allowed to run free on a large plot of land. Such an interpretation does not leave a farmer or rancher and his animals defenseless against marauding dogs. If a trespassing dog is actually found worrying, attacking or killing domestic animals which are *not* confined within the meaning of section 31103, the landowner or his agent may still kill the dog in order to protect his animals, but under privilege of section 31102 and its requirements, not those of section 31103. I respectfully suggest that this interpretation of sections 31102 and 31103 is the only one which gives logical meaning to *all* the language of both. As did the common law, such an interpretation provides needed protection for farmers and ranchers against marauding dogs, while at the same time protecting the legitimate rights of dog owners.

Contrary to the impression created by the majority, I agree that the Legislature was concerned as it obviously should be with livestock owners being able to protect their animals from aggressive, marauding dogs. However, the majority's interpretation ignores the clear intent of the Legislature over the last 57 years to protect domestic animals from *aggressive* canine behavior, not mere failure to observe manmade boundaries.[8]

For lack of any better authority to support their position, the majority relies on a recent press account of dog attacks on livestock. (Majority opn.,

---

[7]The law review commentary cited by the majority (*ante,* p. 263, fn. 2) reaches the same conclusion as I do. "Section 31103 is more limited in its provision [than section 31102]." (Comment, *Animal Law in California* (1985) 12 Pepperdine L.Rev. 567, 590.)

[8]Indeed, under the majority's interpretation, the only way the canine heroine of Lassie Come Home could have successfully traveled the many miles to her goal in California would have been to be equipped with a bulletproof suit.

*ante*, at pp. 263-264.) I, for one, find the threat of dogs (including packs of wild poodles) with split personalities a slim reed on which to base interpretation of the statute before us. In any event, the "evidence" cited by the majority is more appropriately suited to legislative hearings than it is to our task of interpreting the existing statute.

I believe that the interpretation that I have given provides the true legislative intent which resulted from the delicate balancing on the one hand of the clear and absolute right of owners of livestock and fowl to have an immediate self-help remedy to protect their flock from threatening dogs, and, on the other hand, the need to exercise care in not authorizing the senseless and unwarranted killing of a dog who happens to wander over the wrong boundary line.

## Conclusion

In summary, the interpretation of section 31103 proposed by plaintiff is the only interpretation which makes sense in light of the history of the statute, the common law as it relates to that history and a standard rule of statutory construction. In its findings of fact, the trial court determined on the evidence before it that plaintiff's dogs were approximately 200 yards away from the corral where defendants' livestock were confined. Nevertheless, the dogs were shot and the killing was then hidden from plaintiff. The trial court appears to have entered judgment for defendants solely because it could see no way around the bar of section 31103 as it interpreted the statute. I would reverse the judgment in its entirety, hold that plaintiff's action was not and is not barred by section 31103 and remand for a redetermination by the trial court as to the liability and damage issues on *all three* of plaintiff's claims.

A petition for a rehearing was denied May 20, 1986. Sabraw, J., was of the opinion that the petition should be granted. Appellant's petition for review by the Supreme Court was denied July 9, 1986. Bird, C. J., was of the opinion that the petition should be granted.