[Civ. No. 5690.   Fourth Dist.   May 13, 1959.]

HELEN KING, Respondent, v. A. H. KARPE, Appellant.

Deadrich, Bates & Stewart, Deadrich & Bates and Kenneth K. Bates for Appellant.

Conron, Heard & James and Calvin H. Conron, Jr., for Respondent.

STONE, J. pro tem.*—This is an appeal by defendant-appellant from a judgment entered upon a jury verdict in favor of plaintiff-respondent for damages by reason of the destruction of a registered Hereford cow. The defendant was doing business under the name of A. H. Karpe's Greenfield

*Assigned by Chairman of Judicial Council.

Hereford Ranch, and raised, bought, and sold registered Hereford cattle and held sales at his ranch. He owned a particularly fine bull which went by the name of Baca Duke 2nd. In 1952, at one of defendant's cattle sales, plaintiff purchased a registered Hereford cow, one Domino Belle, which was carrying a calf the get of Baca Duke 2nd. Plaintiff paid $2,200 for the animal.

The first calf of Domino Belle was dropped in July of 1952. After the first calf was dropped, plaintiff and defendant entered into an agreement by which Domino Belle was returned to defendant's ranch, for breeding to Baca Duke 2nd, and plaintiff and defendant were to share ownership in the calf. The cow was bred twice before coming safe with calf, and was then taken back by plaintiff to her ranch; the second calf, named "Duke Boniface," was dropped in October of 1953. After this event, plaintiff and defendant again entered into the same agreement with respect to the breeding services of Baca Duke 2nd, whereupon the cow was returned to defendant's ranch, and was bred on three occasions to Baca Duke 2nd before becoming safe with calf. The third calf, named "Duke Boniface 2nd," was born in January of 1955. Later in 1955 a similar arrangement was again made between plaintiff and defendant, for the further breeding of Domino Belle to Baca Duke 2nd. The record indicates that nine separate attempts were made in 1955 to get the cow with calf, all without success. After these unsuccessful attempts, defendant placed Domino Belle with a group of other cows, all identified as "hard breeders," for special attention and care, in an attempt to restore her to brood cow status.

Tattoo marks are placed upon Hereford cattle as a part of the ordinary custom and practice in that business. It is the practice for the ranch owner to tattoo a number on each calf born on his ranch, selecting the numbers anew each year. Thus, the first calf dropped on a ranch in each year might be tattooed "01," the next "02," and so on. This number is usually tattooed in the right or left ear, and the same number is painted on the base of the horn. The letter "L" or "R" is used to indicate the left, or right ear. Domino Belle was identified by the tattoo number L-03. During all of the period in question, defendant had continued to buy and sell cattle, and one cow he purchased had the tattoo mark L-03. This cow was on defendant's ranch when Domino Belle was there.

In 1956, the hard breeding cows were examined by Dr. Irwin, a veterinarian, to cull out of the herd those that were deemed

to be incapable of restoration to brood cow status. Each cow was physically examined, and the determination then made as to whether the cow was ready for breeding or was suitable for further treatment, or was incapable of being restored to brood cow status, and therefore designated for the slaughterhouse. Defendant Karpe was present at this examination of Domino Belle, and Dr. Irwin, the examining veterinarian, was assisted by an employee of defendant, a Mr. Becker. Eighteen of the group were deemed to be beyond reasonable expectation of recovery to brood status, and were sent to the slaughterhouse. As indicated, the cow of plaintiff, Domino Belle, was in this "hard breeder" group, identified only by the tattoo mark L-03. When she was examined, the veterinarian was of the opinion that she was incapable of restoration to brood status. Defendant, believing that Domino Belle was his L-03 cow, included her in the batch consigned to the slaughterhouse. The mistake was not discovered until approximately one month later when plaintiff came to the ranch in August, 1956, and all parties discovered that Domino Belle must have been sent to the slaughterhouse, since defendant still had his own L-03 cow. The jury awarded plaintiff $5,000 damages and defendant appeals.

Defendant presents five grounds of appeal, the first and second of which will be considered together because the answer to each is the same. Defendant urges first that it was error for the court to permit counsel to comment on the failure of defendant to produce a former employee, and second, that it was error for the court to instruct the jury that it could consider the failure of defendant to produce the employee as a witness as presenting weaker and less satisfactory evidence than was available.

The factual situation reflected by the record is that on one day defendant's veterinarian examined approximately 70 "hard breeder" cows, plaintiff's cow being one of them. He could not remember examining the particular cow and relied on and testified from the records made at the time of the examination. It was impracticable for the veterinarian to write while examining the cows so a herdsman named Becker made notes as dictated by the veterinarian. The notes were later copied in the interest of legibility. However, there was a discrepancy between the original notes concerning Domino Belle and the copy thereof. It also appeared that an erasure had been made on the original notes and it appeared that one notation might have been added to the original after it had

been completed. Becker, the man who made the original notations as dictated by the veterinarian, was not called as a witness by the defendant. Plaintiff developed that Becker had been in defendant's employ until a month before the trial and that he was in San Jose at the time of trial. Plaintiff commented to the jury that whereas the veterinarian relied entirely upon the notes taken and because there was a discrepancy in the notes, Mr. Becker who made the notes should have been called as a witness. The trial court saw the evidence in the same light and overruled defendant's objection to such comment, and at plaintiff's request gave an instruction on the subject taken from the last paragraph of BAJI Number 30, which reads as follows:

"If and when you should find that it was within the power of a party to produce stronger and more satisfactory evidence than that which was offered on a material point, you should view with distrust any weaker and less satisfactory evidence actually offered by him or her on that point."

The testimony of the veterinarian was an essential element in defendant's case. Had he testified concerning facts within his own knowledge we would concede appellant's point, but he depended upon the records made by Becker, which were open to question. Therefore, the comment of counsel and the instruction of the court did not constitute error. (Code Civ. Proc., § 2061, subds. 6 and 7; *Hays* v. *Viscome*, 122 Cal.App.2d 135, 141 [264 P.2d 173]; *People* v. *Beal*, 116 Cal.App.2d 475, 479 [254 P.2d 100].)

■ Defendant's third assignment of error is that the court erred in permitting counsel for plaintiff to argue "peculiar value" to the jury. Civil Code, section 3355, provides:

"Where certain property has a peculiar value to a person recovering damages for deprivation thereof, or injury thereto, that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer."

The court gave an instruction embodying this language. Defendant concedes that the instruction is proper in form but argues that it was error to give it because there was neither evidence that the cow had peculiar value to plaintiff nor that the defendant had knowledge of such peculiar value. The evidence as to value was conflicting, the defendant contending that the only value was for meat, approximately $200, while plaintiff claimed great value for breeding purposes in the sum of $10,000. In support of the jury's verdict of $5,000 there

was testimony by the herdsman who had treated Domino Belle that she was destroyed before she had completed the "hard breeder" course of treatment. He also testified that in his opinion she was not sterile and would have produced for another five or six years. The evidence also disclosed that the three bull calves Domino Belle had dropped were outstanding animals. Defendant took a half interest in them as the breeding fee and he exhibited the calves at various shows. There was also testimony that the blood line of Domino Belle produced good calves particularly valuable for inbreeding, and that plaintiff needed this type of stock to build up her herd of Herefords. This constituted evidence of peculiar value. (*Drinkhouse* v. *Van Ness*, 202 Cal. 359, 378 [260 P. 869].) This court will not weigh the substantial evidence which supports the verdict as against defendant's evidence to the contrary. (*Berniker* v. *Berniker*, 30 Cal.2d 439, 444 [182 P.2d 557].) The other essential element of proving damages of "peculiar value" is proof that defendant had knowledge of such "peculiar value" before he incurred liability for damages. The evidence disclosed that defendant was a leading breeder of registered Herefords and as such should have been well aware of the results of inbred stock with outstanding and unusual qualities. The defendant was also familiar with the plaintiff's herd and as an expert Hereford breeder should have known the needs of the herd. Defendant sold Domino Belle to the plaintiff and he thought well enough of the cow to breed her to his renowned bull, Baca Duke 2nd, and demand a half interest in the calves, which calves won several awards for their outstanding qualities. All of this was known to defendant before he accepted the cow at his ranch for breeding and treatment the fourth time, when the unfortunate incident occurred. Thus, defendant had "knowledge" within the meaning of the statute. Since evidence pertaining to the requirements of Civil Code, section 3355, was introduced during the trial, the question of whether plaintiff proved "peculiar value" was a factual question for the determination of the jury and that question was properly submitted to it for decision.

Defendant's fourth specification of error pertains to an instruction given by the court concerning conflicting opinions of expert witnesses. Defendant contends there was no conflict because the veterinarian who examined the cow for defendant testified that in his opinion the cow was sterile. This position assumes that the herdsman who testified to the contrary was not an expert. The herdsman had been treating

the cow and he gave as his opinion that she could have been made productive by additional treatments. It was established that defendant had the cow sent to the slaughterhouse before the recommended course of treatments had been completed. The only merit to defendant's argument lies in his contention that his expert was a veterinarian while plaintiff's expert was simply a herdsman. However, the evidence discloses that the herdsman was born and reared on a cattle ranch and that he had worked with cattle all of his adult life. He testified that he had attended a cattle-breeding school on three different occasions. Hence, sufficient foundation was laid to qualify the herdsman as an expert on the subject of cattle breeding. Whether he was as well qualified as a licensed veterinarian was a question for the jury to consider. The court quite properly instructed the jury that:

"In this case there has been a conflict in the testimony of expert witnesses. You must resolve that conflict. To that end, you must weigh one expert's opinion against that of another, the reasons given by one against those of another, and the relative credibility and knowledge of the experts who have testified. Thereupon, you shall find in favor of that expert testimony which, in your opinion, is entitled to the greater weight."

■ Defendant's final assignment of error alleges misconduct and reversible error on the part of plaintiff's counsel in asking defendant questions concerning the size of his ranch, whether he owned more than one ranch and whether his ranch had not formerly been owned by President Hoover. When defense counsel objected to the questions counsel for plaintiff explained to the court that he was asking the questions for the purpose of showing the scope of defendant's operations to indicate his standing as a top ranking registered Hereford breeder. Defendant contends these questions were asked for the sole purpose of conveying to the jury the idea that he was a very wealthy man and could afford to pay a substantial judgment. If this were the purpose of plaintiff's counsel it would indeed be highly prejudicial and unethical. The trial court was satisfied with the explanation insofar as good faith is concerned but sustained the defendant's objections upon the ground the questions were not material. The court made appropriate remarks and it does not appear that the jurors were influenced or misled by the questions.

■ Defendant also cites as misconduct a question asked defendant as to whether he had paid $80,000 or $90,000 for

the bull Baca Duke 2nd. The court sustained an objection to the question for the same reason objections were sustained to questions concerning the size and nature of defendant's ranch operations. However, the question of the value of the bull was material. The bull had been bred to the cow concerned in this action and the testimony was that they had at least one common ancestor. It would not seem reasonable that a breeder of registered Herefords would waste the services of such a valuable bull on a mediocre cow. Particularly so when the owner of the bull demanded a half interest in the calves produced. The ultimate fact was the value of the cow, but the value of the bull to which she had been bred was material to that issue. The record does not reflect reversible error by reason of the conduct of counsel for plaintiff.

The judgment is affirmed.

Griffin, P. J., and Shepard, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 8, 1959. Peters, J., was of the opinion that the petition should be granted.