[No. D014819. Fourth Dist., Div. One. July 14, 1993.]

RENA SELDEN, Plaintiff and Respondent, v.
MELVYN I. DINNER et al., Defendants and Appellants.

**COUNSEL**

McInnis, Fitzgerald, Rees, Sharkey & McIntyre, Barton H. Hegeler, Rhonda L. Miller, Horvitz & Levy, S. Thomas Todd and Mary F. Dant for Defendants and Appellants.

Rena Selden, in pro. per., for Plaintiff and Respondent.

**OPINION**

**BENKE, Acting P. J.**—In this case there is no evidence the defendant plastic surgeon acted below the standard of care for plastic surgeons or that he acted in an intentional or outrageous manner. Accordingly we reverse a $400,000 judgment entered against him for failing to perform promised breast surgery on the plaintiff.

## FACTUAL AND PROCEDURAL BACKGROUND

### I

#### *Plaintiff's Medical History*

Plaintiff and respondent Rena Selden has a family and personal history of breast cancer. Her mother and grandmother both died of breast cancer, and a paternal aunt had breast cancer and underwent a mastectomy. In 1975 cancer was found in Selden's left breast and she herself underwent a mastectomy. In 1980 reconstructive surgery was performed on Selden and a breast implant was inserted in her chest. In light of personal and family history, in 1988 an oncologist recommended that Selden undergo a preventive mastectomy of her right breast.

### II

#### *July 12, 1988, through July 25, 1988*

A. *July 12*

On July 12, 1988, Selden contacted defendant and appellant Melvyn Dinner, M.D., a plastic surgeon. At the time Selden contacted Dinner, he was in Cleveland, Ohio, where he had established his plastic surgery practice and she was in Phoenix, Arizona, where she was practicing law.

Selden discussed with Dinner the possibility of undergoing the preventive mastectomy and "abdominal island flap" reconstructive procedures on both

breasts. Dinner was a nationally recognized expert in performing this reconstructive procedure and Selden had consulted with him in 1985 about the possibility of undergoing it. Because Dinner was in the midst of moving his practice to La Jolla, he suggested Selden come to his La Jolla office on July 19 for a consultation.

B. *July 19*

On July 19 Selden met with Dinner in La Jolla and she advised him there was some urgency in having the surgery performed because the medical insurance which would cover it was due to expire on July 31. Dinner scheduled the mastectomy and reconstructive surgery for July 25 at Scripps Memorial Hospital (Scripps) in La Jolla.

Paul Hyde, M.D., agreed to perform the mastectomy and eventually he agreed to monitor Dinner's performance of the reconstructive surgery. Dinner needed a monitor because his application for surgical privileges at Scripps had not yet been approved. Although the hospital's regulations required that Dinner be monitored by another plastic surgeon, Dinner did not locate one in time for Selden's surgery and the chief of staff at Scripps approved Hyde as a monitor.

C. *July 25*

Selden checked into Scripps on the morning of July 25, put on a surgical gown and was placed on a gurney. After Selden had been waiting a little more than an hour, Dinner appeared in her room and told her the surgery would not be performed that day. According to Selden, Dinner was very agitated. He explained to her the hospital had initially refused to allow him to perform the surgery without monitoring by a plastic surgeon, that there had been a big argument about the surgery and that although the hospital eventually relented and permitted the surgery to go forward with Hyde as a monitor, by that time Dinner felt he was too upset to properly perform the surgery.[1]

Dinner told Selden she should get dressed and meet him at his La Jolla clinic where they could discuss rescheduling the procedure. When they met at Dinner's clinic, Dinner told Selden to return to Phoenix and that he would arrange to perform the surgery in Cleveland before July 31.

[1]At trial the chief of plastic surgery at Scripps denied there had been any vigorous argument or confrontation.

## III

### *July 1988 through November 1989*

Although Dinner had promised to schedule the surgery in Cleveland before July 31, on July 29 or July 30 Dinner told Selden he was unable to do so and that because her insurance was due to expire he would assist her in making other arrangements for payment. Those arrangements were not successful because they depended on Selden's willingness to obtain insurance which cost as much in premiums as it would provide in benefits.

By February 1989 Selden had obtained new employment and a new insurance policy which would cover the surgery, but it was due to expire at the end of February. Selden attempted to contact Dinner in Cleveland but his partner told her he was unavailable.

As a result of her experience both in La Jolla and later in failing to obtain any new surgical date from Dinner, Selden experienced feelings of helplessness, fear and depression. She was shaking all the time, could not stop crying and began taking tranquilizers and later, antidepressant drugs.

Nonetheless between February 1989 and November 1989, Selden underwent five surgical procedures in Phoenix performed by a Phoenix physician, Ben Dekay Soe, M.D. Soe performed the preventive mastectomy and, rather than the abdominal island flap surgery Dinner had planned, Doe reconstructed Selden's breasts with implants.[2]

## IV

### *These Proceedings*

On July 25, 1989, Selden filed a complaint against Dinner, Dinner's La Jolla clinic and Scripps, alleging they were liable to her for breach of contract, detrimental reliance, intentional infliction of emotional distress, negligent infliction of emotional distress and medical nonfeasance. In 1990 Selden dismissed her claims against Scripps.

Trial commenced on January 23, 1991. The trial court prevented Selden from pursuing any claim the defendants were guilty of professional negligence because Selden was not prepared to present any expert testimony. The

---

[2]Although Selden had no complaints about the work performed by Soe, she does not believe the result achieved with the implants is as natural in appearance as the result Dinner could have provided her had Dinner performed the abdominal island flap procedure.

trial court also ruled Selden could not recover damages for emotional distress as an element of her breach of contract claim. The trial court also granted the defendants a nonsuit with respect to Selden's claim of intentional infliction of emotional distress. The trial court did however permit Selden to pursue her claim for negligent infliction of emotional distress.

The defendants proposed a verdict form which would have separated Selden's economic damages from her total damages. The trial court refused the defendants' form and provided the jury with a general verdict form. The jury returned a verdict in favor of Selden and awarded her $400,000 in damages. Judgment was entered in that amount, and the defendants filed a timely notice of appeal.

## ISSUES ON APPEAL

On appeal Dinner and the clinic contend that because at most Selden presented evidence of $30,000 in economic losses, the balance of $370,000 in damages must have been awarded for Selden's emotional distress. They contend this portion of the verdict should be reversed because the record does not support an award of emotional distress damages. We agree and reverse.

## DISCUSSION

### I

We begin our analysis of the issues raised in this case by agreeing with the trial court's ruling preventing Selden from recovering emotional distress damages as part of her breach of contract claim. We take up the contract issue because, although Selden did not file a cross-appeal, as she points out, we nonetheless are obligated to uphold the judgment on any theory supported by the record. (See 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, §§ 259-263, pp. 266-271, but see also *Coalition for L. A. County Planning etc. Interest* v. *Board of Supervisors* (1977) 76 Cal.App.3d 241, 246 [142 Cal.Rptr. 766].)

In general, damages are not recoverable for mental suffering resulting from breach of contract. (*O'Neil* v. *Spillane* (1975) 45 Cal.App.3d 147, 159 [119 Cal.Rptr. 245].) While recognizing the general rule, Selden argues we should follow cases which have created an exception where the contract "by its nature put[s] [the defendant] on notice that a breach would result in emotional and mental suffering by [plaintiff]. [Citations.]" (*Ross* v. *Forest Lawn Memorial Park* (1984) 153 Cal.App.3d 988, 995 [203 Cal.Rptr. 468, 42

A.L.R.4th 1049].) She argues that since it was clear she desired the surgery for emotional reasons, Dinner should have expected his failure to perform the surgery would have a devastating emotional impact on her. We decline to follow this path because none of the cases Selden relies on involve breach of an agreement to provide medical services.

For instance, we note a mortuary which breaches its contract with a decedent's family by mishandling a corpse or failing to provide adequate security at a funeral may be required to pay damages for emotional distress suffered by the family. (*Chelini* v. *Nieri* (1948) 32 Cal.2d 480, 482 [196 P.2d 915]; *Ross* v. *Forest Lawn Memorial Park, supra,* 153 Cal.App.3d 988, 994-995.) Similarly a jeweler who mishandles heirlooms may be held liable for the owner's emotional distress. (*Windeler* v. *Scheers Jewelers* (1970) 8 Cal.App.3d 844, 851 [88 Cal.Rptr. 39].) This theory of liability has also been extended to a limousine driver who abandoned passengers although he had been hired because the passengers expected to become inebriated at a party. (*Rogoff* v. *Grabowski* (1988) 200 Cal.App.3d 624, 633 [246 Cal.Rptr. 185].)

What, in the final analysis, separates these cases from Dinner's broken promise to perform surgery on Selden is Dinner's independent obligation to meet a medical standard of care in treating Selden. That standard of care required that Dinner exercise the degree of skill, knowledge and care ordinarily possessed and exercised by members of the medical profession under similar circumstances. (*Munro* v. *Regents of University of California* (1989) 215 Cal.App.3d 977, 984 [263 Cal.Rptr. 878].) Significantly, a medical standard of care can only be established by way of expert medical testimony. (*Ibid.*)

Dinner's obligation to meet the professional standard of care is critical in considering the measure of Selden's contract damages because we are unwilling to create a substantial incentive which conflicts with that obligation. If, as the record strongly suggests, the standard of care required that Dinner cancel Selden's surgery on July 25 because of his emotional state, holding him liable for emotional distress damages on a breach of contract theory would create a powerful financial incentive to act below the standard of care. In refusing to create such an incentive, we note that our Supreme Court has consistently found that where they conflict, the public concerns which are articulated in our system of tort law must prevail over the private interests embodied in contracts. (See, e.g., *Foley* v. *Interactive Data Corp.* (1988) 47 Cal.3d 654, 665-671 [254 Cal.Rptr. 211, 765 P.2d 373].)

We also note that in none of the cases which have permitted recovery of emotional distress damages for a breach of contract, was the defendant

subject to potentially conflicting tort and contract obligations. The professional and contractual obligations of the funeral parlor, the jeweler and the chauffeur are entirely consistent: to provide agreed-upon services.[3]

## II

■ We also agree with the trial court's ruling barring Selden's professional negligence claim. As we have noted, no medical malpractice claim is viable without expert testimony establishing the appropriate standard of care. (*Munro* v. *Regents of Univeristy of California*, *supra*, 215 Cal.App.3d at p. 984.) " ' "The standard of care against which the acts of a physician are to be measured is a matter peculiarly within the knowledge of experts; it presents the basic issue in a malpractice action and can only be proved by their testimony [citations], unless the conduct required by the particular circumstances is within the common knowledge of the layman." [Citations.]' " (*Ibid.*) Here, the emotional circumstances under which a surgeon should perform elective surgery are beyond a layperson's knowledge, and, since Selden did not present any expert testimony, the trial court quite properly prevented Selden from pursuing her malpractice claim.

## III

■ Next we turn to Selden's claim for negligent infliction of emotional distress.

### A. *Physical Impact/Bystander*

Like every other person in the state, Dinner was duty bound to act with due care in conducting his affairs. (See Civ. Code, § 1714.) ■ However, recovery for emotional distress caused by a breach of this fundamental duty has been carefully limited. As the Supreme Court explained in *Thing* v. *La Chusa* (1989) 48 Cal.3d 644, 664 [257 Cal.Rptr. 865, 771 P.2d 814]: "In order to avoid limitless liability out of all proportion to the degree of a defendant's negligence, and against which it is impossible to insure without imposing unacceptable costs on those among whom the risk is spread, the right to recover for negligently caused emotional distress must be limited."

Initially, the right to recover for emotional distress in negligence cases was limited to circumstances "in which the victim himself was injured and emotional distress was a 'parasitic' item of damages, or if a plaintiff who had been in the 'zone of danger' did not suffer injury from impact, but did

---

[3]Dinner's obligation to meet a professional standard of care also prevents recovery of any emotional distress damages on a theory of detrimental reliance.

suffer physical injury as a result of the emotional trauma." (*Thing* v. *La Chusa, supra,* 48 Cal.3d at p. 651.)

These initial limitations have been relaxed somewhat over the years. Nonetheless, at present, where a negligence plaintiff was not the victim of physical impact or within a zone of danger, emotional distress damages are permitted only if the plaintiff (1) is a witness to physical injury inflicted on a third person, (2) is closely related to the injury victim, (3) is present at the time the injury occur, and (4) suffers serious emotional distress. (*Thing* v. *La Chusa, supra,* 48 Cal.3d at pp. 667-668.)

 Here, there is no evidence which suggests Selden suffered any physical impact as a result of Dinner's negligence or observed such impact suffered by a loved one. Accordingly, Dinner's breach of the general duty of care will not support an award of emotional distress damages.

## B. *Direct Victim*

Because Selden was not the victim of any physical harm committed by Dinner and was not a bystander who witnessed physical harm suffered by a loved one, her claim for negligent infliction of emotional distress must be based upon on her relationship with Dinner. (*Burgess* v. *Superior Court* (1992) 2 Cal.4th 1064, 1075 [9 Cal.Rptr.2d 615, 831 P.2d 1197].) "[A] cause of action to recover damages for negligently inflicted emotional distress will lie, notwithstanding the criteria imposed upon recovery by bystanders, in cases where a duty arising from a pre-existing relationship is negligently breached. [Citations.]" (*Burgess, supra,* 2 Cal.4th at p. 1074.)

In *Burgess* the plaintiff mother sought to recover damages from her obstetrician for the emotional distress she suffered when her infant son was severely injured in the course of delivery. The court found the doctor's duty to the mother included preventing injury to the fetus she was carrying. In finding the mother could therefore recover for the distress she suffered the court stated: "[O]nce the scope of the duty of care assumed by [the doctor] to [the mother] is understood, [the mother's] claim for emotional distress damages may simply be viewed as an *ordinary professional malpractice* claim, which seeks as an element of damage[,] compensation for her serious emotional distress. The elements of a claim for professional negligence incorporate a specific standard of care into the elements of a negligence claim." (*Burgess, supra,* 2 Cal.4th at p. 1077, italics added.)

 Here, as in *Burgess*, the plaintiff's relationship with the defendant was solely a physician-patient relationship. The duties which were imposed

on Dinner by virtue of the relationship were twofold: to fulfill his promises to Selden and to treat her within the standard of care. (See *Custodio* v. *Bauer* (1967) 251 Cal.App.2d 303, 311-316 [59 Cal.Rptr. 463, 27 A.L.R.3d 884]; see also *Burgess, supra*, 2 Cal.4th at p. 1075.) We are unaware of any other duty which arises *by virtue* of the physician-patient relationship.

As we explained in part I, emotional distress damages are not available in an action against a physician for breach of a contract to provide medical services. More importantly, as we noted in part II, Selden presented no viable cause of action for medical malpractice.

In short then, neither the contractual nor tort aspects of Dinner's relationship with Selden support an award of emotional distress damages growing out of any negligence on Dinner's part. Accordingly, although the trial court acted properly in limiting the measure of contract damages and dismissing Selden's malpractice claim, it erred in denying Dinner's motion for nonsuit on Selden's negligent infliction of emotional distress claim.

## IV

Because there is no legal basis for recovery of emotional distress damages, those damages must be deleted from Selden's recovery. Dinner concedes that, including the cost of future abdominal island flap surgery, Selden presented evidence she suffered $30,182.85 in economic losses caused by his breach of contract. On the other hand Selden argued to the jury that the likely cost of the future surgery was $50,000 to $60,000. Because of the general verdict employed by the trial court, we have no means of determining how the jury resolved this conflict over the amount of Selden's economic losses. Moreover, given the disparity in the parties' estimates of the likely cost of future surgery, we are in no position to resolve the conflict ourselves.

Accordingly, the judgment is reversed with instructions to the trial court to determine the amount of Selden's contract damages and enter judgment in her favor in that amount.[4] Appellants to recover their costs of appeal.

Froehlich, J., and Nares, J., concurred.

Respondent's petition for review by the Supreme Court was denied September 30, 1993.

---

[4]Given our disposition of Selden's claim for emotional distress damages, we do not need to consider Dinner's additional contention the judgment exceeds the limit set by Civil Code section 3333.2 (Medical Injury Compensation Reform Act).