[No. G040324. Fourth Dist., Div. Three. July 31, 2009.]

GAIL M. McMAHON, Plaintiff and Appellant, v.
DIANE CRAIG et al., Defendants and Respondents.

**COUNSEL**

Gail M. McMahon, in pro. per., for Plaintiff and Appellant.

Schiff Hardin and Bruce A. Wagman for Animal Legal Defense Fund as Amicus Curiae on behalf of Plaintiff and Appellant.

Wallace, Brown & Schwartz and George M. Wallace for Defendants and Respondents.

Shook, Hardy & Bacon, Paul B. La Scala, Victor E. Schwartz and Philip S. Goldberg for California Veterinary Medical Association, Animal Health Institute, American Animal Hospital Association, American Kennel Club, Cat Fanciers' Association, American Pet Products Association, American Veterinary Medical Association and Pet Industry Joint Advisory Council as Amici Curiae on behalf of Defendants and Respondents.

**OPINION**

**ARONSON, J.**—Plaintiff Gail M. McMahon sued defendants Diane Craig, D.V.M., Veterinary Surgical Specialists, Inc., and Advanced Veterinary Specialty Group, LLC, for, inter alia, veterinary malpractice and intentional infliction of emotional distress after McMahon's dog died while in defendants' care. McMahon contends the trial court erred in sustaining defendants' demurrer to her intentional infliction of emotional distress cause of action and in striking portions of her complaint seeking damages for emotional distress and loss of companionship.

■    We conclude the trial court did not err. McMahon's complaint alleges defendants negligently rendered veterinary care and lied to cover up their malpractice. None of defendants' alleged conduct, however, is so extreme or outrageous to support a cause of action for intentional infliction of emotional distress. Emotional distress damages for negligence are not available to McMahon because she was neither a witness nor a direct victim of defendants' negligent acts. Finally, McMahon cannot recover damages for loss of companionship based on her dog's peculiar value to her. "[P]eculiar value" under Civil Code section 3355 refers to an item's characteristics that enhance its economic value to the owner, and does not include the owner's emotional attachment to it. Accordingly, we affirm.

I

FACTUAL AND PROCEDURAL BACKGROUND

According to the first amended complaint, McMahon is an owner, occasional breeder, fancier, and handler of Maltese show dogs. One of the dogs McMahon owned was "Tootsie," a purebred Maltese. Tootsie's parents were champions, and she was the last of her bloodline. Tootsie "possessed exceptional and distinctive qualities for the needs and desires of plaintiff, including temperament, breed confirmation, and intelligence."

When Tootsie was two years old, she began to show signs of respiratory distress, which was diagnosed as laryngeal paralysis. Around age five,

Tootsie's problem became severe and interfered with the quality of her life. In December 2004, McMahon met with Craig, a doctor of veterinary medicine and a surgeon at the hospital. Craig confirmed the laryngeal paralysis diagnosis and recommended corrective surgery, in which Craig would tie back one of the two laryngeal folds in Tootsie's throat to open the airway and increase respiration. During presurgical consultations, McMahon told Craig about Tootsie's history, described her strong bond with Tootsie, and explained she would do whatever she could, regardless of cost, to help the animal. By letter, McMahon's friend told Craig about the special bond McMahon had with Tootsie, and McMahon's extensive efforts to have Tootsie's illness diagnosed. McMahon alleged defendants understood Tootsie's peculiar value to McMahon, and that McMahon would be emotionally devastated if Tootsie died.

Craig advised McMahon that aspiration pneumonia posed the biggest concern following surgery. McMahon understood that defendants would employ all necessary precautions to reduce this risk, including withholding all food and water from Tootsie for about 24 hours after surgery. Before Tootsie attempted to swallow for the first time, it was essential to allow the swelling in her throat to subside and the sedating drugs to wear off.

After Craig operated on Tootsie, she instructed a technician to give the animal water mixed with baby food within two hours of her surgery to test her ability to swallow. When this was done, Tootsie immediately aspirated the mixture into her lungs. Craig advised McMahon by telephone the next day that Tootsie had acquired aspiration pneumonia. Craig falsely claimed Tootsie had been given only water the day before. Craig reassured McMahon this was not a major setback, and promised her Tootsie would receive the best care and be monitored closely. Craig did not inform McMahon Tootsie had been given water mixed with baby food and the pneumonia posed a serious, life-threatening situation.

Contrary to Craig's promises, Tootsie was placed in a cage and left unmonitored in the back of the hospital. Defendants failed to provide appropriate antibiotics, oxygen, glucose, and other supportive care necessary to sustain life in a critical patient. Tootsie died about midnight the day after surgery and her death was discovered accidentally when a technician checked on another dog.

In the days immediately following Tootsie's death, Craig denied in writing that Tootsie ingested any food. Craig told McMahon Tootsie was under constant care and "never left alone." She suggested the likely cause of Tootsie's death was from aspiration of "oral secretions." Upon McMahon's request, defendants gave her some veterinary records regarding Tootsie, but

initially withheld records demonstrating Tootsie had been given a mixture of food and water within two hours after surgery. After defendants learned McMahon obtained the omitted records from a third party, they altered their records to make them consistent with the third party documents.

A necropsy performed on Tootsie showed the animal likely died from aspiration pneumonia caused by food in her lungs. Three days after the operation, Craig directed the hospital to charge McMahon's credit card for all unpaid services rendered to Tootsie, without McMahon's knowledge or consent. They knew McMahon would not agree to pay for Tootsie's treatment.

McMahon sued defendants, alleging claims for, inter alia, veterinary malpractice, negligent failure to inform, intentional misrepresentation, negligent misrepresentation, constructive fraud, conversion, and intentional infliction of emotional distress. After the trial court sustained defendants' demurrer and granted defendants' motion to strike, McMahon filed a first amended complaint restating with greater clarity the same causes of action. As to the first amended complaint, the trial court again sustained without leave to amend defendants' demurrer to McMahon's cause of action for intentional infliction of emotional distress. The court also granted without leave to amend defendants' motion to strike McMahon's damage claims for loss of companionship and emotional distress. After defendants answered and the parties conducted discovery, McMahon determined the trial court's rulings had severely impaired the value and viability of her case. Accordingly, McMahon stipulated to judgment against her to expedite appeal of the trial court's rulings. McMahon now appeals the judgment.[1]

II

DISCUSSION

A. *General Principles Concerning Demurrer*

On appeal from a judgment after an order sustaining a demurrer, we review the order de novo, exercising our independent judgment on whether the

---

[1] Ordinarily a judgment entered pursuant to a stipulation is not appealable. (*Adoption of Matthew B.* (1991) 232 Cal.App.3d 1239, 1267 [284 Cal.Rptr. 18].) But an exception exists where the appellant's consent to judgment was given merely to facilitate an appeal following the trial court's adverse determination of a critical issue. (*Building Industry Assn. v. City of Camarillo* (1986) 41 Cal.3d 810, 817 [226 Cal.Rptr. 81, 718 P.2d 68].) To be appealable the stipulated judgment must fully resolve all claims in the underlying litigation. (*Morehart v. County of Santa Barbara* (1994) 7 Cal.4th 725, 743 [29 Cal.Rptr.2d 804, 872 P.2d 143].) The judgment in this case specifies that "plaintiff shall take nothing by her first amended complaint" against any of the defendants, and therefore fully adjudicates plaintiff's entire case.

complaint states a cause of action as a matter of law. (*Desai v. Farmers Ins. Exchange* (1996) 47 Cal.App.4th 1110, 1115 [55 Cal.Rptr.2d 276].) We give the complaint a reasonable interpretation, reading it as a whole and viewing its parts in context. (*Blank v. Kirwan* (1985) 39 Cal.3d 311, 318 [216 Cal.Rptr. 718, 703 P.2d 58].) We deem all properly pleaded material facts as true. (*Serrano v. Priest* (1971) 5 Cal.3d 584, 591 [96 Cal.Rptr. 601, 487 P.2d 1241].) We must also accept as true those facts that may be implied or inferred from those expressly alleged. (*Marshall v. Gibson, Dunn & Crutcher* (1995) 37 Cal.App.4th 1397, 1403 [44 Cal.Rptr.2d 339].)

While the decision to sustain or overrule a demurrer is a legal ruling subject to de novo review on appeal, the granting of leave to amend involves an exercise of the trial court's discretion. (*Hernandez v. City of Pomona* (1996) 49 Cal.App.4th 1492, 1497–1498 [57 Cal.Rptr.2d 406].) When the trial court sustains a demurrer without leave to amend, we must also consider whether the complaint might state a cause of action if a defect could reasonably be cured by amendment. If the defect can be cured, then we must reverse the judgment of dismissal to allow the plaintiff an opportunity to correct the error. The plaintiff bears the burden of demonstrating a reasonable possibility to cure any defect by amendment. (*Hendy v. Losse* (1991) 54 Cal.3d 723, 742 [1 Cal.Rptr.2d 543, 819 P.2d 1].) A trial court abuses its discretion if it sustains a demurrer without leave to amend when the plaintiff shows a reasonable possibility to cure any defect by amendment. (*Aubry v. Tri-City Hospital Dist.* (1992) 2 Cal.4th 962, 967 [9 Cal.Rptr.2d 92, 831 P.2d 317].) If the plaintiff cannot show an abuse of discretion, the trial court's order sustaining the demurrer without leave to amend must be affirmed. (*Hernandez,* at p. 1498.)

B.  *Defendants' Alleged Acts Do Not Give Rise to Emotional Distress Damages*

█ " '[T]he negligent causing of emotional distress is not an independent tort but the tort of negligence . . . .' [Citation.] 'The traditional elements of duty, breach of duty, causation, and damages apply. [¶] Whether a defendant owes a duty of care is a question of law. Its existence depends upon the foreseeability of the risk and upon a weighing of policy considerations for and against imposition of liability.' " (*Marlene F. v. Affiliated Psychiatric Medical Clinic, Inc.* (1989) 48 Cal.3d 583, 588 [257 Cal.Rptr. 98, 770 P.2d 278], italics omitted (*Marlene F.*).) The law in California imposes a duty to avoid causing emotional distress in two general instances.

The first involves "bystander" situations "in which a plaintiff seeks to recover damages as a percipient witness to the injury of another." (*Christensen v. Superior Court* (1991) 54 Cal.3d 868, 884 [2 Cal.Rptr.2d 79,

820 P.2d 181] (*Christensen*).) "Because in such cases the class of potential plaintiffs could be limitless, resulting in the imposition of liability out of all proportion to the culpability of the defendant, this court has circumscribed the class of bystanders to whom a defendant owes a duty to avoid negligently inflicting emotional distress. These limits are set forth . . . as follows: 'In the absence of physical injury or impact to the plaintiff himself, damages for emotional distress should be recoverable only if the plaintiff: (1) is closely related to the injury victim, (2) is present at the scene of the injury-producing event at the time it occurs and is then aware that it is causing injury to the victim and (3) as a result suffers emotional distress beyond that which would be anticipated in a disinterested witness.' " (*Burgess v. Superior Court* (1992) 2 Cal.4th 1064, 1073 [9 Cal.Rptr.2d 615, 831 P.2d 1197] (*Burgess*).)

Here, McMahon was not present at the scene when the injury-producing event occurred. Accordingly, McMahon does not fall under the bystander category of persons to whom a duty to avoid causing emotion distress is owed.

The second source of duty is found where the plaintiff is a "direct victim," in that the emotional distress damages result from a duty owed the plaintiff "that is 'assumed by the defendant or imposed on the defendant as a matter of law, or that arises out of a relationship between the two.' " (*Burgess, supra*, 2 Cal.4th at p. 1073.) McMahon argues that she had a special relationship with defendants akin to the physician-patient relationship that imposed a duty on defendants to avoid causing her emotional distress. We disagree.

In support of her claim, McMahon cites a series of cases in which a duty arose by virtue of a doctor-patient relationship. But although a veterinarian is hired by the owner of a pet, the veterinarian's medical care is directed only to the pet. Thus, a veterinarian's malpractice does not directly harm the owner in a manner creating liability for emotional distress. This point becomes clear upon review of the cases upon which McMahon principally relies.

In *Burgess*, the California Supreme Court found a special relationship between an obstetrician and the plaintiff, a mother who was giving birth to a child. The court rejected the defendant's argument that the mother and child should be treated as two separate patients in determining the existence of a duty to avoid causing emotional distress due to negligent harm to the child. On this point, the court explained that: "during pregnancy and delivery it is axiomatic that any treatment for Joseph necessarily implicated Burgess's participation since access to Joseph could only be accomplished with Burgess's consent and with impact to her body." (*Burgess, supra*, 2 Cal.4th at p. 1076.)

The court in *Burgess* further noted the close emotional relationship between a mother and child: "The birth of a child is a miraculous occasion which is almost always eagerly anticipated and which is invested with hopes, dreams, anxiety, and fears. In our society a woman often elects to forego general anesthesia or even any anesthesia, which could ease or erase the pain of labor, because she is concerned for the well-being of her child and she anticipates that her conscious participation in and observance of the birth of her child will be a wonderful and joyous occasion. An obstetrician, who must discuss the decision regarding the use of anesthesia with the patient, surely recognizes the emotionally charged nature of pregnancy and childbirth and the concern of the pregnant woman for her future child's well-being. The obstetrician certainly knows that even when a woman chooses to or must undergo general anesthesia during delivery, the receiving of her child into her arms for the first time is eagerly anticipated as one of the most joyous occasions of the patient's lifetime. It is apparent to us, as it must be to an obstetrician, that for these reasons, the mother's emotional well-being and the health of the child are inextricably intertwined." (*Burgess, supra,* 2 Cal.4th at p. 1076.) Accordingly, the court concluded that "[a]ny negligence during delivery which causes injury to the fetus and resultant emotional anguish to the mother, therefore, breaches a duty owed directly to the mother." (*Ibid.*)

The present case is easily distinguishable from *Burgess,* for several reasons. First, unlike the obstetrician in *Burgess,* defendants' care of Tootsie would not directly impact McMahon's health. Second, unlike a mother and child, a pet owner's emotional well-being is not traditionally "inextricably intertwined" with the pet's physical well-being. Although a pet owner may be emotionally involved in the pet's health, nothing in *Burgess* suggests this relationship would give rise to "direct victim" liability for a veterinarian's malpractice. Indeed, the father of a newborn child, like the mother, undoubtedly anticipates the birth as "a wonderful and joyous occasion." Yet, the Supreme Court in *Burgess* did not extend the "special relationship" duty owed by the obstetrician to the father. On this point, the court observed: "[T]he physician-patient relationship critical to a mother's cause of action is almost always absent in a father's claim. It, therefore, appears that a father must meet the [bystander liability] criteria set forth in *Thing* [*v. La Chusa* (1989)] 48 Cal.3d 644 [257 Cal.Rptr. 865, 771 P.2d 814], if he is to state a viable claim." (*Burgess, supra,* 2 Cal.4th at p. 1078, fn. 8.) If the Supreme Court would not extend "direct victim" status to the father of a child under a doctor's care, it assuredly would not extend it to the owner of a pet under a veterinarian's care.

The present situation is also readily distinguishable from *Molien v. Kaiser Foundation Hospitals* (1980) 27 Cal.3d 916 [167 Cal.Rptr. 831, 616 P.2d 813]

(*Molien*), in which the defendant medical providers misdiagnosed the plaintiff's wife as having a venereal disease. Because of the negligent misdiagnosis, the plaintiff's wife became upset and suspicious that the plaintiff had engaged in extramarital sexual activities. The husband also became upset when, upon the defendants' directive, the wife told her husband of the diagnosis. The resulting tension and hostility caused a breakup of their marriage and the initiation of divorce proceedings. Noting the "universally accepted gravity of a false imputation of syphilis," the court concluded the plaintiff had adequately alleged a claim for emotional distress damages. (*Id.* at p. 931.) The court recognized that the risk of harm to the husband was reasonably foreseeable when the doctor directed her to inform her husband of the diagnosis, and therefore the "alleged tortious conduct of [the] defendant was directed to him as well as to his wife." (*Id.* at p. 923.)

The situation here is a far cry from that in *Molien*. Defendants' malpractice could not have affected McMahon in the severe manner it affected the plaintiff whose wife was misdiagnosed with syphilis. Moreover, the Supreme Court later criticized *Molien* to the extent it suggested foreseeability as the only limit on duty, noting that if "*Molien* . . . stands for this proposition, it should not be relied upon and its discussion of duty is limited to its facts. As recognized in *Thing*, '[I]t is clear that foreseeability of the injury alone is not a useful "guideline" or a meaningful restriction on the scope of [an action for damages for negligently inflicted emotional distress.]' " (*Burgess, supra*, 2 Cal.4th at p. 1074.) Accordingly, *Molien* is of no benefit to McMahon.

Plaintiff also relies on *Marlene F., supra*, 48 Cal.3d 583, in which a therapist treating mothers and their minor children molested the children. The court determined the mothers had adequately alleged negligence giving rise to emotional distress damages because the therapist had treated both the mothers and the children. The court noted the limited nature of its holding: "It bears repeating that the mothers here were the patients of the therapist along with their sons, and the therapist's tortious conduct was accordingly directed against both. They sought treatment for their children . . . and agreed to be treated themselves to further the purposes of the therapy." (*Id.* at p. 591.) The present situation is readily distinguishable because McMahon was never a patient of defendants.

Finally, McMahon relies on *Jacoves v. United Merchandising Corp.* (1992) 9 Cal.App.4th 88 [11 Cal.Rptr.2d 468] (*Jacoves*). There, the court determined the parents of a young adult who committed suicide stated a cause of action seeking emotional distress damages for negligence against a hospital that had treated their son. The court determined the hospital owed a direct duty to the parents because, inter alia, the parents were "active instrumentalities in [their

son]'s treatment," and the hospital's doctors " 'treat[ed] the family in a family session weekly' " in which the parents "were intended to benefit from their participation in group therapy with [their son]." (*Id.* at pp. 109–110.)

The *Jacoves* court distinguished the situation of the plaintiffs there with the plaintiff in *Schwarz v. Regents of University of California* (1990) 226 Cal.App.3d 149 [276 Cal.Rptr. 470]. In *Schwarz,* the defendant treated the plaintiff's minor son for bedwetting and an adjustment disorder arising from his parents' divorce. The father agreed to pay for the son's therapy and periodically met with the therapist to assist in the son's therapy. Later, the therapist assisted the mother in removing the son from the country and concealing the son's whereabouts from the father for almost two years. Nonetheless the appellate court in *Schwarz* determined the father was not a direct victim of the psychotherapist's negligence and could not state a cause of action for negligent infliction of emotional distress. The court held: "[W]hen the negligence is alleged to have occurred during the medical treatment of the child, the defendant's conduct is directed solely at the child, the intended third party beneficiary of the contract [citation], and not at the parent who enters into the contract solely as a surrogate for the minor child . . . [citation]. [Citation.] In sum, the simple existence of a contract between a parent and a medical caregiver to provide medical treatment for a child is not in itself sufficient to impose on the caregiver a duty of care owed to the parent. [Fn. omitted.]" (*Id.* at p. 168.)

■ McMahon also relies on *Erlich v. Menezes* (1999) 21 Cal.4th 543 [87 Cal.Rptr.2d 886, 981 P.2d 978] (*Erlich*) to support her direct victim theory. There, the California Supreme Court held that the negligent performance of a commercial contract does not entitle a plaintiff to recover emotional distress damages. (*Id.* at p. 558.) An exception to this general rule occurs "when the express object of the contract is the mental and emotional well-being of one of the contracting parties . . . ." (*Id.* at p. 559.) McMahon contends defendants undertook a duty to protect her emotional health when they agreed to provide veterinary care to Tootsie after learning of McMahon's special bond to her dog. We disagree.

The contract between McMahon and defendants to treat Tootsie did not by itself demonstrate defendants undertook a duty to protect McMahon's mental and emotional tranquility. (Cf. *Selden v. Dinner* (1993) 17 Cal.App.4th 166, 175–176 [21 Cal.Rptr.2d 153] [duty to protect patient's emotional health does not arise by virtue of physician-patient relationship].) Nor did McMahon's description to defendants of her close relationship to Tootsie establish that defendants agreed to protect McMahon's emotional well-being as part of the contract to provide veterinary services for her dog. *Gonzales v. Personal Storage, Inc.* (1997) 56 Cal.App.4th 464 [65 Cal.Rptr.2d 473] illustrates the

point. There, the plaintiff explained when leasing storage space that she would be storing rare furniture, keepsakes, heirlooms, and other personal items. (*Id.* at p. 469.) Plaintiff sued the storage company for emotional distress when it negligently allowed another party to abscond with her property, arguing the company breached a contractual duty to protect her emotional well-being. The appellate court rejected this argument, holding that the landlord-tenant relationship between the plaintiff and the storage company did not give rise to a duty to protect plaintiff's emotional tranquility. (*Id.* at p. 474.) Similarly, McMahon's description of her close relationship with Tootsie did not make her emotional tranquility an object of the contract when defendants agreed to treat Tootsie. As *Erlich* explains, a more explicit undertaking by defendants is required to impose liability for negligent infliction of emotional distress. (*Erlich, supra,* 21 Cal.4th at p. 559.)

Regardless of how foreseeable a pet owner's emotional distress may be in losing a beloved animal, we discern no basis in policy or reason to impose a duty on a veterinarian to avoid causing emotional distress to the owner of the animal being treated, while not imposing such a duty on a doctor to the parents of a child receiving treatment. As recognized by the Massachusetts Appeals Court in *Krasnecky v. Meffen* (2002) 56 Mass.App.Ct. 418, 422–423 [777 N.E.2d 1286, 1289] (*Krasnecky*), in a similar case: "It would be illogical . . . to accord the plaintiffs greater rights than would be recognized in the case of a person who suffers emotional distress as a result of the tortiously caused death of a member of his immediate family." (See also *Altieri v. Nanavati* (1989) 41 Conn.Supp. 317, 320 [573 A.2d 359, 361] ["There is no reason to believe that malpractice on the family pet will receive higher protection than malpractice on a child or spouse."].)

Moreover, permitting plaintiffs to recover emotional distress damages for harm to a pet would likely increase litigation and have a significant impact on the courts' limited resources. On this point, we share the sentiment of the court in *Johnson v. Douglas* (N.Y.Sup.Ct. 2001) 187 Misc.2d 509, 510 [723 N.Y.S.2d 627], which observed: "There is no doubt that some pet owners have become so attached to their family pets that the animals are considered members of the family. This is particularly true of owners of domesticated dogs who have been repeatedly referred to as 'Man's Best Friend' and a faithful companion. . . . Although we live in a particularly litigious society, the court is not about to recognize a tortious cause of action to recover for emotional distress due to the death of a family pet. Such an expansion of the law would place an unnecessary burden on the ever burgeoning case loads of the court in resolving serious tort claims for injuries to individuals." (*Ibid.*)

Finally, extending emotional distress damages to owners of companion pets based on veterinary malpractice would have unknown consequences on both

the cost and availability of veterinary care. Indeed, defining the limits of potential liability would be difficult. Because humans are not related to pets, limits cannot be based on degree of consanguinity. Is every family member residing with the pet a human companion and potential plaintiff? Moreover, what pets would qualify as companion animals? Few would dispute the long-standing bond between humans and dogs, but limiting emotional distress damages to dog owners would affront those who love cats. Few would consider livestock companion animals, but consider the facts in *Krasnecky*, in which the "plaintiffs regarded the[ir] sheep as their 'babies' and spent six or seven hours a day with them, giving them names and celebrating their birthdays with special food and balloons. They patted, hugged, and brushed the sheep and baked snacks for them." (*Krasnecky, supra*, 777 N.E.2d at p. 1288.) As one court noted, "it would be difficult to cogently identify the class of companion animals because the human capacity to form an emotional bond extends to an enormous array of living creatures." (*Rabideau v. City of Racine* (2001) 243 Wis.2d 486, 501 [627 N.W.2d 795, 802].)

These considerations persuade us to conclude that any extension of a duty of care to avoid emotional distress to pet owners is a matter best left to the Legislature. Accordingly, we conclude the trial court did not err in striking McMahon's allegations seeking emotional distress damages for negligence.

C.  *The Trial Court Did Not Err in Sustaining the Demurrer to McMahon's Intentional Infliction of Emotional Distress Claim Without Leave to Amend*

In her complaint, McMahon alleges defendants recklessly gave Tootsie food two hours after the surgery, failed to provide the necessary postoperative care they promised to furnish, and lied to McMahon about the severity of Tootsie's recovery complication and its cause. McMahon also alleges defendants knew of her close attachment to Tootsie before performing the surgery. She contends these allegations adequately allege extreme and outrageous conduct sufficient to support a cause of action for intentional infliction of emotional distress. We disagree.

"The tort of intentional infliction of emotional distress is comprised of three elements: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff suffered severe or extreme emotional distress; and (3) the plaintiff's injuries were actually and proximately caused by the defendant's outrageous conduct. [Citation.] . . . [¶] In order to meet the first requirement of the tort, the alleged conduct ' ". . . must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." [Citation.] Generally, conduct will be found to be actionable where the

"recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!' " [Citation.]' [Citation.] That the defendant knew the plaintiff had a special susceptibility to emotional distress is a factor which may be considered in determining whether the alleged conduct was outrageous." (*Cochran v. Cochran* (1998) 65 Cal.App.4th 488, 494 [76 Cal.Rptr.2d 540] (*Cochran*).) However, "[i]t is not enough that the conduct be intentional and outrageous. It must be conduct directed at the plaintiff, or occur in the presence of a plaintiff of whom the defendant is aware." (*Christensen, supra,* 54 Cal.3d at p. 903.) Accordingly, defendants' alleged acts of malpractice do not meet the prerequisites for an intentional infliction of emotional distress claim because, as we have explained, they were neither directed at McMahon nor were they done in her presence. (*Ibid.*)

McMahon contends, however, that defendants' attempts to cover up their malpractice coverage constitutes "[f]raudulent conduct, which supports an award of punitive damages, [and] is inherently despicable and grouped in the same classification as conduct which is 'oppressive,' which by definition is despicable." Asserting an allegation of fraudulent conduct is sufficient to support an intentional infliction of emotional distress claim, McMahon relies on *Katsaris v. Cook* (1986) 180 Cal.App.3d 256 [225 Cal.Rptr. 531] (*Katsaris*).

In *Katsaris*, the plaintiff's dogs escaped while the plaintiff was out of town. The dogs entered the defendant's cattle ranch, and were shot to death by one of the defendant's employees. The plaintiff began searching for the dogs when he discovered they were missing. Although the employee had notified the defendant of the dogs' killing, the defendant denied knowing the dogs' whereabouts to the plaintiff. After 10 days of searching for the dogs, the plaintiff learned what had become of them. The trial court granted a motion for judgment at the close of the plaintiff's case, determining the privilege created by Food and Agricultural Code section 31103, which allows the killing of dogs entering onto property containing livestock, barred each of the plaintiff's claims. The appellate court, however, reversed as to the cause of action for intentional infliction of emotional distress because the statute did not apply to the defendant's conduct after the dogs were killed. (*Katsaris, supra,* 180 Cal.App.3d at pp. 268–269.)

*Katsaris* does not aid McMahon. The *Katsaris* court reversed the trial court's grant of judgment solely because the court determined the statutory privilege did not apply to the defendant's actions after the dogs were killed. The court did not determine the defendant's acts supported a claim for intentional infliction of emotional distress. To the contrary, the *Katsaris* court noted that in the context of the case, the defendant's acts of failing to notify

the owner of the dogs' death and lying to the owner in response to the owner's inquiry were by themselves *insufficient* to demonstrate the level of reckless disregard for the plaintiff's emotional well-being necessary to support a claim for intentional infliction of emotional distress. (*Katsaris, supra,* 180 Cal.App.3d at p. 268.) On this point, the court stated that it *was not* deciding whether the defendant's "conduct went sufficiently beyond the acts outlined above to demonstrate her reckless disregard for [the plaintiff's] emotional distress." (*Id.* at p. 268, fn. 6.)

Even if we assume, however, the defendant's acts in *Katsaris* supported a claim for intentional infliction of emotional distress, defendants' efforts to cover up their malpractice does not approach the level of disregard for the plaintiff's emotional distress in *Katsaris*. There, the defendant's false statements misled the plaintiff into several days of fruitless searching for his dogs. Here, McMahon was informed immediately after her dog died. Defendants' attempts to hide their alleged malpractice were not likely to greatly increase the level of McMahon's distress over losing her dog, which she knew had died.

True, as McMahon points out, defendants' alleged acts might be viewed as fraudulent and despicable conduct supporting punitive damages if a tort otherwise existed. But "[i]n evaluating whether the defendant's conduct was outrageous, it is 'not . . . enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.' " (*Cochran, supra,* 65 Cal.App.4th at p. 496.)

Because defendants' alleged acts were neither done in her presence nor directed at McMahon as necessary to support a claim for intentional infliction of emotional distress, nor does the alleged cover up rise to the extremity required in *Cochran*, we conclude the trial court did not err in sustaining demurrers to this cause of action. As McMahon did not demonstrate she could further amend her complaint to allege additional acts in support of this claim, we conclude the trial court did not abuse its discretion in denying leave to amend.

D.  *The Trial Court Did Not Err in Striking McMahon's Loss of Companionship Damages from Her Complaint*

Civil Code section 3355 provides: "Where certain property has a peculiar value to a person recovering damages for deprivation thereof, or injury thereto, that may be deemed to be its value against one who had notice thereof before incurring a liability to damages in respect thereof, or against a willful wrongdoer." In her complaint, McMahon sought $100,000 for loss of companionship, alleging companionship was an element of Tootsie's "peculiar value." McMahon contends the trial court erred in striking this element of her damages. We disagree.

Peculiar value under Civil Code section 3355 refers to a property's unique economic value, not its sentimental or emotional value. In an early case considering an animal's "peculiar" value, *Roos v. Loeser* (1919) 41 Cal.App. 782 [183 P. 204], the plaintiff sought damages for the death of his dog caused by the defendant's negligence. On the amount of damages sought, the court observed the elements of the dog's peculiar value to include its pedigree, reputation, age, health, and ability to win dog shows. (*Id.* at p. 785.) Thus, *Roos* clearly considered "peculiar value" to refer to special characteristics, which increase the animal's monetary value, not its abstract value as a companion to its owner.

Similarly, in *King v. Karpe* (1959) 170 Cal.App.2d 344 [338 P.2d 979], the court affirmed the plaintiff's recovery for the peculiar value of a cow destroyed by order of the defendant's veterinarian. Although the defendant contended the value of the cow was for its meat, approximately $200, the plaintiff claimed the cow had great value in breeding, and was worth approximately $10,000. In upholding the jury's award of $5,000, the court noted the evidence supporting the award under Civil Code section 3355 included the high quality and value of the calves the cow had produced, and the plaintiff's specific need for these calves. (*King*, at pp. 348–349.) Although not considering the value of an animal, the federal district court in *Robinson v. U.S.* (E.D.Cal. 2001) 175 F.Supp.2d 1215, 1232, applied California law and, relying in part on *King*, concluded that "[t]estimony regarding the sentimental value of the property, or any speculative valuations of the property must necessarily be excluded."

■ On this subject, comment e to the Restatement Second of Torts, section 911[2] explains: "*Peculiar value to the owner.* The phrase 'value to the

---

[2] Restatement Second of Torts, section 911, provides: "(1) As used in this Chapter, value means exchange value or the value to the owner if this is greater than the exchange value. [¶] (2) The exchange value of property or services is the amount of money for which the subject matter could be exchanged or procured if there is a market continually resorted to by traders,

owner' denotes the existence of factors apart from those entering into exchange value that cause the article to be more desirable to the owner than to others. [¶] . . . [¶] Even when the subject matter has its chief value in its value for use by the injured person, if the thing is replaceable, the *damages for its loss are limited to replacement value, less an amount for depreciation*. . . . If the subject matter cannot be replaced, however, as in the case of a destroyed or lost family portrait, the owner will be compensated for its special value to him, as evidenced by the original cost, and the quality and condition at the time of the loss. Likewise an author who with great labor has compiled a manuscript, useful to him but with no exchange value, is entitled, in case of its destruction, to the value of the time spent in producing it or necessary to spend to reproduce it. *In these cases, however, damages cannot be based on sentimental value. Compensatory damages are not given for emotional distress caused merely by the loss of the things,* except that in unusual circumstances damages may be awarded for humiliation caused by deprivation, as when one is deprived of essential articles of clothing." (*Id.* at pp. 474–475, italics added.)

McMahon asserts that a companion animal should be treated more like a human being than an inanimate object when applying Civil Code section 3355. But California law does not allow parents to recover damages for loss of affection and society of their children who are injured or killed through the negligence of another; instead, damages are largely limited to loss of earnings or the child's services of economic value. (*Baxter v. Superior Court* (1977) 19 Cal.3d 461, 465–466 [138 Cal.Rptr. 315, 563 P.2d 871].) On this subject, our Supreme Court has observed: "Loss of consortium is an intangible injury for which money damages do not afford an accurate measure or suitable recompense; recognition of a right to recover for such losses in the present context, moreover, may substantially increase the number of claims asserted in ordinary accident cases, the expense of settling or resolving such claims, and the ultimate liability of the defendants. Taking these considerations into account, . . . we have concluded that the payment of damages to persons for the lost affection and society of a parent or child neither truly compensates for such loss nor justifies the social cost in attempting to do so." (*Borer v. American Airlines, Inc.* (1977) 19 Cal.3d 441, 444 [138 Cal.Rptr. 302, 563 P.2d 858].)

We recognize the love and loyalty a dog provides creates a strong emotional bond between an owner and his or her dog. But given California law does not allow parents to recover for the loss of companionship of their children, we are constrained not to allow a pet owner to recover for loss of

or if no market exists, the amount that could be obtained in the usual course of finding a purchaser or hirer of similar property or services. The rental value of property is the exchange value of the use of the property." (*Id.* at p. 472.)

the companionship of a pet. Accordingly, we conclude the trial court did not err in striking McMahon's loss of companionship allegations.

III

DISPOSITION

The judgment is affirmed. Defendants are entitled to their costs of this appeal.

O'Leary, Acting P. J., and Fybel, J., concurred.

A petition for a rehearing was denied August 31, 2009, and the opinion was modified to read as printed above.